**Know Your Rights: The Prison Litigation Reform Act (PLRA)**

**The Prison Litigation Reform Act (PLRA) makes it harder for prisoners to file lawsuits in federal court. This fact sheet outlines the information you need to know before filing a lawsuit.**

# THE PRISON LITIGATION REFORM ACT (PLRA)

If you are thinking about filing a lawsuit, then you should know about a 1996 law called the Prison Litigation Reform Act (PLRA), which makes it harder for prisoners to file lawsuits in federal court.   There are many parts to the PLRA, but the following parts are the most important for you to understand.

## I.        EXHAUSTION OF ADMINISTRATIVE REMEDIES (42 U.S.C. § 1997e(a))

The First key to remember about the PLRA is that before you file a lawsuit, you must try to resolve your complaint through the prison's grievance procedure.  This usually requires that you give a written description of your complaint (often called a "grievance") to a prison official.  If the prison provides a second or third step (like letting you appeal to the warden), then you must also take those steps.  If you file a lawsuit in federal court before taking your complaints through every step of your prison's grievance procedure, it will almost certainly be dismissed.

### A.     What is exhaustion?

Exhausting your remedies for the PLRA requires filing a grievance and pursuing all available administrative appeals.[1]  In addition, every claim you raise in your lawsuit must be exhausted.[2]    However, if a prisoner does not file a grievance because he is unable to obtain grievance forms, no administrative remedy is "available" and the prisoner may file in court.[3]     In a multi-step grievance system, if staff fail to respond within the time limits established in the grievance system's rules, the prisoner must appeal to the next stage.[4]  If the prisoner does not receive a response at the final appeal level, and the time for response has passed, the prisoner has exhausted.[5]

An exception to the requirement that all appeals be taken occurs if the prisoner cannot appeal without a decision from the lower level of the grievance system, and the lower level did not respond to the grievance.[6]

Courts have differed widely on when failure to exhaust might be excused.[7]  But the safest course is always:

> with respect to **each claim** you want to raise, and **each defendant** you want to name, in your eventual lawsuit, you should **file a grievance** and **appeal** that grievance through **all available levels of appeal**.

You should get a copy of your prison or jail's grievance policy and follow it as closely as you can.

### B.     What happens if you don't exhaust the grievance process?

Most courts have held that failure to exhaust is an affirmative defense that must be raised by the defendants.[8]  Then, if the court finds that the prisoner has not exhausted, the case is dismissed without prejudice,[9] meaning that the lawsuit may be filed again once the prisoner has exhausted, as long as the statute of limitations has not run.

There is not a great deal of case law yet addressing whether a prisoner who misses a deadline in the grievance process (many grievance systems have very short deadlines) forever loses his/her constitutional or statutory claim.  If you are in this situation, you should appeal through all the levels of the grievance system and explain in the grievance the reasons for the failure to file on time.[10]

Finally, the statute of limitations is tolled while a prisoner is in the process of exhausting.[11]

## C.    There are very few exceptions to the exhaustion requirement.

Prisoners seeking to bring a damages action must exhaust available administrative remedies even if the administrative remedy in question, like almost all prison grievance systems, does not provide money damages as a possible remedy.[12]

Other means of notifying prison officials of your complaint, such as speaking to staff, putting in a kite, or writing to the warden, do not constitute exhaustion.  You must use the grievance system.

In the only decision to address this issue, the District of Columbia Circuit Court of Appeals said that under PLRA, courts may still issue injunctions to prevent irreparable injury pending exhaustion of administrative remedies.[13]

The exhaustion requirement does not apply to detainees in INS facilities.[14]  Also, the exhaustion requirement does not apply to cases filed before the effective date of PLRA, which is April 26, 1996.[15]

## II. FILING FEES (28 U.S.C. § 1915(b)).

The Second key to remember about the PLRA is that all prisoners must pay court filing fees in full.  If you do not have the money up front, you can pay the filing fee over time through monthly installments from your prison commissary account, but the filing fee will not be waived.

A complex statutory formula requires the indigent prisoner to pay an initial fee of 20% of the greater of the prisoner's average balance or the average deposits to the account for the preceding six months.   After the initial payment, the prisoner is to pay monthly installments of 20% of the income credited to the account in the previous month until the fee has been paid.

A major complication of this procedure is that it requires the prison or other facility holding the prisoner to cooperate administratively in the process for assessing the court's statutory fee.  The courts can require the prison administration to provide the necessary information.[16]

### III.   THREE STRIKES PROVISION (28 U.S.C. § 1915(g))

The Third key thing to remember about the PLRA is that each lawsuit or appeal you file that is dismissed because a judge decides that it is frivolous, malicious, or does not state a proper claim counts as a "strike." After you get three strikes, you cannot file another lawsuit *in forma pauperis* – that is, you cannot file unless you pay the entire court filing fee up-front. The only exception to this rule is if you are at risk of suffering serious physical injury in the immediate future.

An appeal of a dismissed action that is dismissed is a separate strike.[17]  Even dismissals that occurred prior to the effective date of PLRA count as strikes.[18]

An exception to the "three strikes" rule may be invoked if a prisoner is in imminent danger of serious physical injury.[19]  A court will evaluate the "imminent danger" exception at the time the prisoner attempts to file the new lawsuit, not at the time that the incident that gave rise to the lawsuit occurred.[20]

### IV.        PHYSICAL INJURY REQUIREMENT (42 U.S.C. § 1997e(e))

The Fourth key to remember about the PLRA is that you cannot file a lawsuit for mental or emotional injury unless you can also show physical injury.

The requirement of physical injury only applies to money damages, it does not apply to claims for injunctive and declaratory relief.[21]  Some courts have suggested the possible availability of nominal and punitive damages even when compensatory damages are barred by the requirement of physical injury.[22]  The courts are split on whether a claim for violation of constitutional rights is intrinsically a claim for mental or emotional injury in the absence of an allegation of a resulting physical injury (or injury to property).[23]  Not surprisingly, the courts differ in their evaluation of what constitutes sufficient harm to qualify as a physical injury.[24]

Last updated 11/02.

[1] White v. McGinnis, 131 F.3d 593 (6th Cir. 1997).

[2] See, e.g., Bey v. Pennsylvania Dept. of Corrections, 98 F. Supp. 2d 650 (E.D. Pa. 2000); Cooper v. Garcia, 55 F. Supp. 2d 1090 (S.D. Cal. 1999).

[3] Miller v. Norris, 247 F.3d 736 (8th Cir. 2001).

[4] White v. McGinnis, 131 F.3d 593 (6th Cir. 1997).

[5] Powe v. Ennis, 177 F.3d 393 (5th Cir. 1999).  Cf.  Lewis v. Washington, 300 F.3d 829 (7th Cir. 2002) (when prison officials do not respond to a prisoner's initial grievance, administrative remedies are exhausted).

[6] Taylor v. Barrett, 105 F. Supp. 2d 483 (E.D. Va. 2000); see also Miller v. Tanner, 196 F.3d 1190 (11th Cir. 1999) (prisoner had exhausted when told by staff no appeal possible); Pearson v. Vaughn, 102 F. Supp. 2d 282 (E.D. Pa. 2000) (same).

[7] See, e.g., Miller v. Tanner, 196 F.3d 1190 (11th Cir. 1999) (prisoner who failed to sign and date grievance form did not fail to exhaust administrative remedies; inmate did not fail to exhaust remedies by failing to appeal institutional-level denial of his grievance, after being told unequivocally that no such appeal was possible); Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000) (substantial compliance with grievance procedure will satisfy exhaustion requirement); cf. Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000) (holding that investigation of complaint by Secretary of Corrections rather than regular grievance system

satisfied exhaustion requirement); but see Freeman v. Francis, 196 F.3d 641 (6th Cir. 1999) (investigations by use of force committee and state police are not exhaustion).

[8] Some of the circuits holding that failure to exhaust is an affirmative defense are Ray v. Kertes, 285 F.3d 287 (3d Cir. 2002); Wyatt v. Terhune, 315 F.3d 1108 (9th Cir. 2003); Foulk v. Charrier, 262 F.3d 687 (8th Cir. 2001) (treating failure to exhaust as affirmative defense but allowing amendment to raise defense); see also Jackson v. District of Columbia, 254 F. 3d 262 (D.C. Cir. 2001); Massey v. Helman, 196 F.3d 727 (7th Cir. 1999); Jenkins v. Haubert, 179 F.3d 19 (2d Cir. 1999); Underwood v. Wilson, 151 F.3d 292 (5th Cir. 1998) (exhaustion requirement may be subject to waiver). The Sixth Circuit alone requires dismissal on the court's own initiative if the prisoner does not demonstrate exhaustion in the complaint. Brown v. Toombs, 139 F.3d 1102 (6th Cir. 1998).

[9] Perez v. Wisconsin Dept. of Correction, 182 F.3d 532 (7th Cir. 1999); Wendell v. Asher, 162 F.3d 887 (5th Cir. 1998); Wright v. Morris, 111 F.3d 414 (6th Cir. 1997).

[10] Harper v. Jenkins, 179 F.3d 1311 (11th Cir. 1999) (holding that prisoner who filed an untimely grievance was obliged to seek a waiver of the time limits in the grievance system); see also Days v. Johnson, 322 F.3d 863 (5th Cir. 2003) (when prisoner's grievance was untimely because he had a broken hand and could not write, dismissal for failure to exhaust was improper); Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir. 2002) (prisoner who missed deadline on one of the levels of appeals of the grievance system barred from filing lawsuit).

[11] Johnson v. Rivera, 272 F.3d 519 (7th Cir. 2001); Brown v. Morgan, 209 F.3d 593 (6th Cir. 2000); Harris v. Hegmann, 198 F.3d 153 (5th Cir. 1999).

[12] Booth v. Churner, 121 S. Ct. 1819 (2001).

[13] Jackson v. District of Columbia, 254 F.3d 262 (D.C. Cir. 2001).

[14] Edwards v. Johnson, 209 F.3d 772 (5th Cir. 2000).

[15] See, e.g., Salahuddin v. Mead, 174 F.3d 271 (2d Cir. 1999); Bishop v. Lewis, 155 F.3d 1094 (9th Cir. 1998); Brown v. Toombs, 139 F.3d 1102 (6th Cir. 1996).

[16] Hall v. Stone, 170 F.3d 706 (7th Cir. 1999) (holding warden in contempt for failure to forward fees from the prisoner's account).

[17] Jennings v. Natrona Co. Detention Center, 175 F.3d 775 (10th Cir. 1999); Patterson v. Jefferson Corrections Center, 136 F.3d 626 (5th Cir. 1998).

[18] See e.g., Ibrahim v. District of Columbia, 208 F.3d 1032 (D.C. Cir. 2000); Welch v. Galie, 207 F.3d 130 (2d Cir. 2000).

[19] See Gibbs v. Cross, 160 F.3d 962 (3d Cir. 1998) (plaintiff alleged an imminent danger of serious physical injury where dust, lint and shower odor came from his cell vent, causing him to suffer "severe headaches, changes in voice, mucus that is full of dust and lint, and watery eyes."). See also Ashley v. Dilworth, 147 F.3d 715 (8th Cir. 1998) (allegations that staff placed plaintiff in proximity to known enemies satisfied imminent danger requirement).

[20] Abdul-Akbar v. McKelvie, 239 F.3d 307 (3d Cir. 2001)(en banc).

[21] See  Harper v. Showers, 174 F.3d 716 (5th Cir. 1999); Perkins v. Kansas Dept. of Corrections, 165 F.3d 803 (10th Cir. 1999); Davis v. District of Columbia, 158 F.3d 1342 (D.C. Cir. 1998).

[22] See Allah v. Al-Hafeez, 226 F.3d 247 (3d Cir. 2000) (claims for nominal and punitive damages can go forward); Searles v. Van Bebber, 251 F.3d 869 (10th Cir. 2001) (PLRA does not bar punitive and nominal damages for violation of prisoner's rights); Davis v. District of Columbia, 158 F.3d 1342 (D.C. Cir. 1998) (noting possibility that nominal damages would survive).

[23] See Rowe v. Shake, 196 F.3d 778 (7th Cir. 1999) (First Amendment claim not barred by physical injury requirement); Canell v. Lightner, 143 F.3d 1210 (9th Cir. 1998) (claim for violation of First Amendment is not a claim for mental or emotional injury); cases going the other way include Thompson v. Carter, 284 F.3d 411 (2d Cir. 2002); Searles v. Van Bebber, 251 F.3d 869 (10th Cir. 2001); Allah v. Al-Hafeez, 226 F.3d 247 (3d Cir. 2000) (First Amendment claims involve mental or emotional injuries); Davis v.  District of Columbia, 158 F.3d 1342 (D.C. 1998) (claim for violation of privacy is claim for mental or emotional injuries).

[24] See Gomez v. Chandler, 163 F.3d 921 (5th Cir. 1999) (allegations of cuts and abrasions satisfy physical injury requirement); Liner v. Goord, 196 F.3d 132 (2d Cir. 1999) (intrusive body searches qualify as physical injury); compare to Herman v. Holiday, 238 F.3d 660 (5th Cir. 2001) (claim of "physical health problems" by prisoner exposed to asbestos does not specify a physical injury which would permit recovery for emotional or mental damages due to fear caused by increased risk of developing asbestos-related disease); Harper v. Showers, 174 F.3d 716 (5th Cir. 1999) (confinement in filthy cell where exposed to

### Sec. 501.009.  Volunteer and Faith-Based Organizations; Report.

(a) The department shall adopt a policy that requires each warden to identify volunteer and faith-based organizations that provide programs for inmates housed in facilities operated by the department. The policy must require each warden to actively encourage volunteer and faith-based organizations to provide the following programs for inmates in the warden's facility:

(1) literacy and education programs;

(2) life skills programs;

(3) job skills programs;

(4) parent-training programs;

(5) drug and alcohol rehabilitation programs;

(6) support group programs;

(7) arts and crafts programs; and

(8) other programs determined by the department to aid inmates in the transition between confinement and society and to reduce incidence of recidivism among inmates.

(b) The policy must require that each warden submit a report to the board not later than December 31 of each year that includes, for the preceding fiscal year, a summary of:

(1) the programs provided to inmates under this section; and

(2) the actions taken by the warden to identify volunteer and faith-based organizations willing to provide programs to inmates and to encourage those organizations to provide programs in the warden's facility.

**HISTORY:**
Enacted by Acts 1989, 71st Leg., ch. 212 (S.B. 1044), § 2.01, effective September 1, 1989; am. Acts 1991, 72nd Leg., ch. 16 (S.B. 232), § 10.01(a), effective August 26, 1991 (renumbered from Sec. 500.009); am. Acts 1995, 74th Leg., ch. 321 (H.B. 2162), § 1.076, effective September 1, 1995; am. Acts 2013, 83rd Leg., ch. 1406 (S.B. 345), § 1, effective September 1, 2013.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

As the First - Mexican-American in Texas to officially unionize "Texas Prisoners", it has been my greatest achievement... Educating, organizing, and getting answers to utilize union resources to rehabilitate, seek companionship, build work experience. This volunteer based training has brought Hope to Texas, and brought forth positive change into "TDCJ". As the Delegate of "IWW-IWOC Local 613 #1.

Texas Board of Criminal Justice, has climbed into the mode of tactical revenge on this unit, by creating repressive policy that has everyone wondering why the sudden attack on inmates. The "TDCJ" has taken away photos, fans, literature, legal information out of the SCFO - inmate handbook, ... Prolonged grievance process by 6 month's on step 1. "Use of Force" has harmed many "IWOC" members, Joshua Jennings, Christopher Yaites, and many "IWOC's" have tested positive for Water-Bourne Bacteria-(H-Pylori).

Some are still being refused H-Pylori testing, ... I, Julio Zuniga have been approved by Dr. Onougu to get Bloodwork done for Arsenic, Lead, PCB's, Aluminum, - all high metals, and after 6 month's of waiting, TDCJ, have refused anyone from getting tested for Cancer causing Water. (Stomach Cancer), Inmate - (Jamal Weber - died after testing positive for H-Pylori)

The Texas Board is creating policy to attempt to stop the positive change, ... inmates want clean water, air condition, heating, clothing, inmate's want an equal amount of Board members on pardons and paroles.

This is a blatant attack on Black, Brown, Poor Whites, Indigenous, Asian Communities. These policies are racist, discriminative, and in Texas Slaveholding Tradition, "Use of Force", is a slave breaking tradition, for slaves who speak out against these policies, ... I am personally on Anti-Depressant's to help stabalize my "PTSD", ... I've had a psychological breakdown, with TDCJ/TBCJ psychological warfare, and the High-Tech Psy-Ops they continue to use against all "IWW-IWOC members, causing pain, suffering maliciously, ... We don't use violence to get what we need, we use solidarity, direct-action, community's help, ... - organizations, such as Texas Prison Reform.com / Texas Civil Rights Project / Ella Baker Center for Human Rights / Fight Toxic Prisons / and many more. TBCJ, has illegally continued to discriminate on our ideology and violate our First Amendment Right's by trying to stop our mail from reaching us, ... They have been enforcing illegal tactic's to open media mail / legal mail, ... Recently I was denied more mail, by "Alexandria Ford", in her word's she says that I am a security threat for reporting to the community the "Hunger Strike" that recently occurred Jan 1st-14th.

Industrial Workers of the World - Incarcerated Workers Organising Committee - Local 613 #1 are fed up with the childish actions of Slave Trade supporting Board members, and the giant discrepancy between highly Educated Board members, and the hiring of un-trained, uneducated prison guard's they use to kill slaves who dare speak out against their authoritarian communist mindset in Texas. Our lives as a whole are being attacked by refusing us access to TDCJ Stamped-Lawlibrary, grievance, medical, so the separation of these departments are what we will continue

To Fight For. If TEXAS BOARD of Criminal Justice ARE so High AND Mighty why is it they Run AND Hide From our Facilitators, organizers, ect, WHEN WE CAMPAIGN. I DON'T Hide ANY thing,.. MongooseDistro.com, THE FINAL STRAW RADIO @ RISE UP.NET (4/23/20) Interview w/ "COMRADE-Z" WILL SERVE AS PROOF of How LONG J have been Fighting THE violent, malicious, CRUEL AND INHUMANE MISTREATMENT OF INMATES IN TEXAS. J've REPORTED 20 + Suicides on the SAME Violent Players that TDCJ-TBCJ KEEP on BOARD To CONTINUE Serving the SLAVE TRADES DIRTY, CORRUPT TACTICS, MAJORS FREDERICK GOODEN / MARCUS COOPER,.. WILLIE RATLIFF, DANIEL PAGE, OFFICER AHOUEY, Sgt. Williams, Sgt. UDOCHUKWU, OFFICER CHUKWU, AND MANY MORE, LIKE CPT. MCKNIGHT WHO ORDERED "JOSHUA JENNINGS" to be SEXUALLY ASSAULTED BY Sgt. UDOCHUKWU, FOR REQUESTING "Respite AREA" IN Triple Digit HEAT, with CEASURE RESTRICTIONS,.. THEY Still ATTACK "JWOC MEMBERS" AND FORCE them to GO TO EXTREMES JUST To get What They ARE Supposed to HAVE,.. THESE SLAVE Breaking TACTICS ARE USELESS, AND WE ARE PRAYING the Relief JWW-JWOC LOCAL 613 #1 IS REQUESTING Will PUT A HALT To STATE VIOLENCE ON MY UNION MEMBERS.

    JWW-JWOC IS NOT going ANY WHERE, AND MY ORGANISATION, IS Helping To Change these Policies Whether "THE STATE OF TEXAS," AND IT'S CORRUPTION OPERATIONS LIKE it OR NOT. WE give FAIR WARNING AND YET our ideology IS Still being illegally discriminated on, AND CONTINUALLY HARRASSED. THIS TIME IT'S NOT JUST ME, BUT, EVERY MEMBER OF the "JWOC", WHO ARE ALL IN GEENERAL Population.

    OUR FREE SPEECH PRIMER get's VIOLATED REGARDLESS OF the FIRST AMMENDMENT RIGHT'S MANDATE,.. THIS IS illegal, AND ALL OF US ARE BEING TARGETED MORE than ANY UNIT IN TEXAS.

    J will NOT STOP Fighting with my RESOURCES, to bring Adequate AMOUNT OF Phones INTO Population, AIR CONDITION / HEATING / Clothing / Clean-DRINKING WATER / AND to END "DRC" Oppressive policy IN MAILROOMS, AND to SEPARATE "GRIEVANCE" AND "LAW LIBRARY" FROM TDCJ / TBCJ.

Julio C. Jennings

X386969

DEAR SIR/MA'AM, AFTER YEARS OF SOLID agitation, AND ACTIVISM IN TEXAS Department of Minimal Justice,... I FIND myself IN A better position NOW, ... I have teamed up my UNION, with (TEXAS PRISON REFORM.com / ENDADSEGTX@gmail.com) Brittany Robertson AND I are working together, and making "TEXAS" really take a good look at the Flaws, Corruption, AND Administrative violence they are useing. THERE WAS A time when INMATES WERE always the violent ones, but, these days, it Just not so. TDCJ, CREATES these environments by Allowing drugs into the Facility, ... AND ENTRAPPING inmates, I've reported 2 dozen Suicides here, UNDER certain Administrators, ... they got promotions FOR it, ... I SENT A "CUSTODIAL DEATH REPORT", printed FROM ATTORNEY GENERAL : KEN PAXTON'S OFFICE, to STATE REPRESENTATIVE : Carl O. Sherman - NORTH TEXAS, ... to show him how the STAFF members MAJORS : FREDERICK GOODEN / MARCUS COOPER WERE INVOLVED DIRECTLY / INDIRECTLY IN ALL OF THE DEATHs that OCCURRED HERE FROM LATE 2017-21. ONE Cpt. NKwelle, got A promotion FOR Assaulting "Joshua Jennings". - THE ASST. WARDEN- Angela Chevalier, who had A DOZEN suicides UNDER her belt, IS NOW A SR. WARDEN @ UTMB - GALVESTON, Endangering lives FURTHER.

I am Requesting A REPRESENTATIVE FROM the D.O.J. To contact me, AND my FRIENDS, ... FOR the purpose of gaining a chance to Report HIGH-LEVEL Corruption in TEXAS, with the Local STATE government, AND "TDCJ, ... to many people are dying, ... AND IT's all VERY much Avoidable, ... PLEASE CONTACT : Brittany Robertson - ENDADSEGTX@gmail.com, tell HER "Z", SENT you.

WE UNDERSTAND you ARE Really Helping the State OF GEORGIA, ... AND WE being ON the FRONTLINE IN TEXAS, ... WANT TO SPEAK to your DEPT. As A UNION DELEGATE, IN TEXAS, ... I am being DENIED ACCESS to the COURT'S AS I am writing you, ... TDCJ, IS VERY WELL AWARE OF my EXISTENCE, AND I have an ACTIVE "CIVIL Rights LAWSUIT", @ UNITED STATES DISTRICT COURT - SOUTHERN DISTRICT - Judge JEFFERY VINCENT BROWN, AND I am PREPARED to FILE A CLASS ACTION LAWSUIT, UNDER : Industrial WORKERS of the World - INCARCERATED WORKERS Organising Committee LOCAL 613 #1. THIS IS AFTER A SENATOR John WHITMEYER, CAME here in LATE July / EARLY August 2021, ... to pay the Bible College A visit For the Last time, ... HE MADE SURE HE HAD ALL IWOC - MEMBERS ATTACKED violently BY TDCJ guards. SR. WARDEN BRIDGETTE Hayes WAS HERE, AND SO WAS ASST. WARDEN- WILLIE RATLIFFE, ... SO, THEY had FULL ACCESS to SURVEILLANCE CAMERA'S AS IT All WENT DOWN.

THE Corruption I exposed only AFFECTED ONE Region, there's SIX REGIONS OF THIS going ON, ... I AM REQUESTING D.O.J, to Contact ME, AND my ATTORNEY : MARK MORALES. com , ... AND Allow me to SPEAK out Against the MISTREATMENT. Thank you.

IWWHTX.ORG

"Z"

IWW - IWOC LOCAL 613 #1

DEPT. OF JUSTICE

PLEASE E-MAIL THIS TO D.O.J.

AND TO UNITED STATES DISTRICT COURT

HOUSTON DIVISION

SOUTHERN DISTRICT.

NATHANIEL OCHSNER

MONGOOSE DISTRO. COM

1/4/22

POSTED

PLEA FROM TEXAS PRISONER

JULIO ZUNIGA

TO A CHECK ONLINE:
FIND OUT IS "NICOLE GILLIER"
STATE REP. RELATED TO
BRYAN COLLIER/TDCJ Director
EXECUTIVE

5/13/21- OFFICER AHOVEY/DIXSON APPEARED TO HAVE COME TO HARRASS ME WHILE I SLEPT IN MY CELL @ H-LINE 214 TOP BUNK - BETWEEN 4:00-4:30 PM. OFFICER AHOVEY ASKED ME TO TAKE down A FLAG I KEEP HANGING OFF MY LOCKER,.- I REMOVED IT, AND HE STAYED STANDING THERE, I COVERED MY FACE BACK UP, AND KEPT SKULKING AND TRYING TO PROVOKE ME INTO AN ALTERCATION, I REMAINED QUIET,.- AFTER A COUPLE OF MINUTES, HE ROLLS the DOOR AND ASKED ME TO GET UP AND, AS I DID THAT, HE BEGINS TO TALK LIKE HE WAS GOING TO ASSAULT ME,.- AND THEN HE PULLS OUT HIS HANDCUFFS,.- ASKED ME TO PUT MY HANDS BEHIND MY BACK,.- BY THIS TIME, I could TELL HE WAS SENT TO MY CELL BY SOMEONE, SO, I REFUSED TO BE RESTRAINED, THEN HE DECIDE'S to BACK UP WHEN I MENTIONED that I WAS GOING TO SHOW HIM, that the CAMERA'S WERE there FOR A REASON,.- SO HE BACKED OFF AND CEASED TO Intimidate ME with LOCKING ME UP,.- HE STATED HE WAS JUST Teaching THE FEMALE GUARD "DIXON", that IS HOW TO DEAL with People LIKE ME.- AND PROCEEDED to ASK ME IF I WANTED to GO to the DAY ROOM, I REFUSED, AND HE LEFT.

AT CHOW HALL HE WAS there watching ME, AND WHEN I WALKED TOWARD HIM HE STOPPED ME to APOLOGIZE TO ME,..... THAT SAME NIGHT HE COMES BACK TO H-LINE PICKET AREA AND ASSAULTS A NOTHER INMATE AND GOT DASHED BY the SAME INMATE,.- LT. LUCAS CAME TO HIS AID. SO, BY THE LOOK'S OF THIS LT. LUCAS IS INSTRUCTING HIS OFFICERS to USE MISCONDUCT TO GET PEOPLE LOCKED UP,.- I WAS ASLEEP AND HARRASSED FOR NOTHING. ON CAMERA.

*Julio A. Zuniga*

5/14/21

FRIDAY

OFFICER Tillman
CAME THE NEXT DAY @ 10:00
TO HARRASS ME FOR 15 minutes



**V E R S O**

Pos: A

149514974

Delivery: 0089513328

*Distributed by Penguin Random House LLC.*

PO#: V5775160-1 DATE: 05/06/2021

| Customer # | Date Ordered | Order # |
|---|---|---|
| 0000770000 | 05/06/2021 | 14479343 |

**SHIPPING ADDRESS:**
JULIO ZUNIGA 1961551
59 DARRINGTON ROAD
DARRINGTON UNIT
ROSHARON, TX 77583
US

**BILLING ADDRESS:**
JULIO ZUNIGA 1961551
DARRINGTON UNIT
59 DARRINGTON RD
ROSHARON, TX 77583-5057
US

| QTY | ITEM # | DESCRIPTION | ITEM PRICE | TOTAL PRICE |
|---|---|---|---|---|
| 1 | 9781784782924 | END OF POLICING, THE | 10.77 | 10.77 |
| | | | **Product Total:** | 10.77 |

| | |
|---|---|
| Product Total | 10.77 |
| Shipping | 3.00 |
| Handling | 0.00 |
| Taxes | 0.00 |
| **Grand Total** | **13.77** |
| **Amount Paid** | **13.77** |
| Payment via | visa |
| Number of boxes | 1 |

Reason for Return:

Incorrect Title/Edition _____

Incorrect Quantity _____

Damaged _____

Other _____

**Mail to:**
*Verso Books*
*20 Jay St Suite 1010*
*Brooklyn, NY 11201 USA*

Page 1/1

**Note:** Thank you for shopping at www.versobooks.com

RETURNS: If there is a problem with your order, please contact Verso Books by emailing orders@versobooks.com, or writing to Verso Books, 20 Jay St, Suite 1010, Brooklyn, NY 11201 USA. If you notify us within 30 days of delivery, we will make good any shortage, or replace any goods that are damaged or defective, or arrange a refund. For our full terms and conditions, please visit www.versobooks.com.

DEAREST SIR, I AM coming to you, with hopes of Social Change, END OF RACISM AND TEXAS Tradition of SLAVERY, — AS THE FIRST MEXICAN AMERICAN MAN to Officially UNIONIZE TEXAS PRISONERS For the GREATER Good of Humanity, ... I am ONE DELEGATE, who STARTED IT ALL IN TEXAS, — I have BEEN UNDER Constant ATTACK Along with my Brothers who are MOSTLY NOW IN AD. Seg FOR REPORTING Suicides, Misconduct, H-pyLORI ATTACK ON US IS INTENTIONALLY Brought on US UNION MEMBERS FOR REFUSING to BE BROKEN By SLAVE BREAKER Tactic's, ... FOR WANTING AIR CONDITIONING, EDUCATION, Clean-WATER, PAROLE Legislation Change, END AD Seg IN TEXAS, AND I WOC IS THE LEADING CAUSE OF ALOT OF FORCED Changes AND THE REASON WE had a positive Track NUMBER OF Death's By Covid.

I am NOT being Allowed To go to School, BECAUSE OFFICERS RETALIATE ON ME BECAUSE DIRECTORS CAME To VISIT US IN CLASS 9/17/21, ... I ASKED THEM To INSTALL MORE PHONES IN Population. 9/24/21 OFFICER had me ESCORTED out IN HANDCUFF'S ON CAMERA FOR NO REASON, IF You VERIFY This, IT will SERVE IN THE FUTURE, IF I ASK THEM to PRESERVE VIDEO, THEy will DENY. ALL OF US ON THIS UNIT ARE ACTIVELY BEING RETALIATED ON ON ALL SIDES, WE HAVE NO REASON To BE DENIED ACCESS To Court, GRIEVANCE PROCESS IS DENYing ALL STEP 1's, FROM NOW TEAMED UP with (END AD Seg TX @ gmail.com) So, TDCJ IS NOW, ATTACKING ME AND MY ENTIRE IWOC LOCAL 613 #1 ... WE ARE ONLY RECOGNIZED AS IWOC LOCAL 613 #1 FOR Fighting FOR PRISONERS RIGHTS, — ALL THE VIOLENCE IS coming from Huntsville TDCJ DIRECTORS, — ALL THE UNION IS WANTING Now, IS To BE allowed HUMAN BASIC RIGHT'S, WE NEED AIR CONDITIONING, CLEAN-WATER, ... I am ONE MAN, AND "TDCJ DIRECTORS" ARE MANY, — THE Court's willingness To LEVEL THE playing FIE ID would Show that THE Constitution IS IN FACT IN Charge OF Humanity's RIGHTS, — TDCJ IS A CRIMINAL ENTERPRISE, RUN BY BLACK AND Brown Body's, ... WE ARE EXPOSING ALL OF This, AND UNDER ATTACK FOR IT, WE NEED it To Stop, ALL OF HUNTSVILLE IS Trying To STOP SOMETHING THAT IS MUCH BIGGER THAN "TDCJ", AND THE PEOPLE ARE UNIONIZING IN RECORD NUMBER'S, AN THE RETALIATION NEED'S To BE ADDRESSED, To MAKE AN EXAMPLE OF "TDCJ" AND IT'S CORRUPTION, SLAVE BREAKING Tactics.   THANK You.

Industrial Workers of The World

Incarcerated Workers Organising Committee

Local 613 #1        JULIO (A) ZUNIG(A) X386969
(DELEGATE)        IWW-IWOC

*B208*

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**CORRECTIONAL INSTITUTIONS DIVISION**

**DIRECTOR'S REVIEW COMMITTEE**
**DECISION FORM**

Offender:   ZUNIGA, Julio          TDCJ-ID#:  1961551

Unit:        DA 007                Date:      01/14/21

The Director's Review Committee (DRC) has rendered a decision regarding your appeal of the Unit decision not to allow you to mail letter advocating for prison disruption in contradiction with BP-03.91, Uniform Offender Correspondence Rules.

The envelope is addressed to:

Matt Brodnax   *PMB#109*   *TDCJ - HUNTSVILLE*
223 Bedford Ave          *Blocked my Financial Supporter*
Brooklyn, NY 11211

It is the decision of the DRC to **uphold** the Unit decision not to allow you to mail the above referenced correspondence and/or item(s).

*From Supporting me as a*

DRC/ LE

*Psychological Attack by Starvation*

copy:  Unit Mailroom
       Matt Brodnax
       file

*And to induce illness by Covid*

*For I am* ~~scribbled~~

B208

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**CORRECTIONAL INSTITUTIONS DIVISION**

**DIRECTOR'S REVIEW COMMITTEE**
**DECISION FORM**

Offender:   ZUNIGA, Julio                    TDCJ-ID#:   1961551

Unit:   DA   007                              Date:   01/14/21

The Director's Review Committee (DRC) has rendered a decision regarding your appeal of the Unit decision not to allow you to mail letter advocating for prison disruption in contradiction with BP-03.91, Uniform Offender Correspondence Rules.

The envelope is addressed to:

> Arwen
> 1730 Montang Ave NE
> Washington, DC 20018

IWW-DC
BRANCH

It is the decision of the DRC to **uphold** the Unit decision not to allow you to mail the above referenced correspondence and/or item(s).

DRC/ LE

copy:   Unit Mailroom
        Arwen
        file

IWW MEMBER WHO IS my CLOSEST FRIEND WAS being ATTACKED By MAILROOM CLERK SUPERVISOR / By ORDER OF WARDENS. 1/24/22

DISCRIMINATION ON UNION MAIL BY

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**CORRECTIONAL INSTITUTIONS DIVISION**

**DIRECTOR'S REVIEW COMMITTEE**
**DECISION FORM**

Offender:   ZUNIGA, Julio                    TDCJ-ID#:  1961551

Unit:        DA  007                          Date:      01/14/21

The Director's Review Committee (DRC) has rendered a decision regarding your appeal of the Unit decision not to allow you to mail letter advocating for prison disruption in contradiction with BP-03.91, Uniform Offender Correspondence Rules.

The envelope is addressed to:

> Bursts O'Goodness c/o The Final Straw Radio @ Riseup -Net
> P.o Box 6004
> Asheville, NC 28816

*(MEDIA MAIL)*

It is the decision of the DRC to **uphold** the Unit decision not to allow you to mail the above referenced correspondence and/or item(s).

DRC/ LE

copy:  Unit Mailroom
       Bursts O'Goodness c/o The Final Straw Radio @ Riseup -Net
       file

*SEALED PRIVELEGED MAIL — MEDIA MAIL*
*TFSR — SHOW OPENED BY RICKEY GARCIA*

THE CRUEL AND UNUSUAL PUNISHMENT: I BEGAN CONTESTING ON THE GRIEVANCES, AND AS I WAITED FOR RESPONSES,... SUICIDE'S OCCURED, 2 in 1 month OF SEPTEMBER. IN POPULATION I had ACCESS to my FACILITATORS by PRISON PHONE. THIS CAUSED both WARDENS to ATTACK ME with PHONE ACCESS RETALIATION, MAILROOM DENIED INCOMING MAIL (INTENTIONALLY) to STOP COMMUNICATION WITH IWW-IWOC MEMBER'S, who is the only people who write ME. When I REPORTED Asst. WARDEN ANGELA CHEVALIER / SR. WARDEN BRUCE ARMSTRONG / MAJOR F. GOODEN / MAJOR K. PHARR / CAPTAIN M. COOPER / to my FACILITATORS FOR CORRUPTION AND MISCONDUCT, AND IMMEDIATELY they TRIED to STOP my MAIL, AND KEPT INTERFERRING IN my PHONE COMMUNICATIONS, by SHUTTING OFF ALL PHONES ON H-LINE. When I (CONFRONTED) MAILROOM SUPERVISOR - ALEXANDRIA FORD - "SHE DENIED ANY RETALIATION /DISCRIMINATION WAS GOING ON,.- SO, ALL my MAIL FROM LATE SEPTEMBER/ EARLY OCTOBER BEGAN ENTERING W/ FIRST AMENDMENT Right'S DISCLAIMER$,... AND STILL do till this day. Asst. WARDEN ANGELA CHEVALIER was ASKED to TAKE ANOTHER JOB by HUNTSVILLE -TDCJ BECAUSE OF the SUICIDES I CAMPAIGNED AGAINST,... IT TOTALED to 13 SUICIDES under these SAME INDIVIDUALS, ...-SO, BEFORE her 2 week NOTICE ENDED she had LT. DUMBOYA AND OFFICER CHUKWU, SET ME UP ON A MORNING ON my way to BREAKFAST. They FABRICATED A STORY AND when I CAME to UCC, she "G5"s ME,... UCC - MS. DAVIS RECOMMENDED G4/ STATUS, so I KNEW IT WAS A RETALIATIVE/ DISCRIMINITIVE ATTACK ON who I WAS, NOT what I did. I CONTESTED it, ASKED FOR PRESERVATION OF VIDEO, AND WAS DENIED ACCESS to GRIEVANCE, I REPORTED it to SGT. BEY - PREA OFFICER, SHE REFUSED to ASSIST. Ms. LINCOLN is REPEATEDLY SABOTAGEING ALL my GRIEVANCE'S,.. STILL is USEING the SAME TACTIC, BECAUSE, I SUCCESSFULLY CREATED the TEXAS LOCAL CHARTER - INCARCERATED WORKERS ORGANISING COMMITTEE. SO, THE COVER-UP'S BEGAN SO AFTER Asst. WARDEN ANGELA CHEVALIER HAD to LEAVE DARRINGTON. I CELEBRATED BY WRITING my FACILITATORS AND GIVING them the NEWS OF GETTING A CORRUPT AND INHUMANE WARDEN REMOVED, WARDEN BRUCE ARMSTRONG, BEGAN SURVEILLING my MAIL, AND WRITING FABRICATED DISCIPLINARY CASES, AND GOT ME INDICTED ON A CELLPHONE AN INMATE THREW IN my CELL IN JULY 2019. RETALIATION/ DISCRIMINATION BEGAN WITH THIS, THEN ON 12/18/20 HIS STG - INTELLIGENCE OFFICERS CAME TO my CELL, ON CAMERA TO "SERVE ME A CASE FOR - "BEING A MEMBER OF A MOVEMENT (IWW-IWOC) AND RECRUITING MEMBERS THAT WOULD MORE THAN LIKELY CAUSE A RIOT." ON NEW YEAR'S EVE I ASKED TO SEE THE EVIDENCE AGAINST my CASE

(1)

Captain M. Cooper REFUSED. I asked him why did they wait 7 month's to give me a Disciplinary case for being a member of the IWW-IWOC. If they knew I was campaigning over the Phone, under survelliance,...they knew I was a member then, they knew all my mail is From Union Members, and proceeded to stall/open/stop priveleged mail to Retaliate on me for reporting Misconduct/and Discrimination to the Media. Officer "Rickey garcia" continued to infringe upon my First Amendment Right", even though I sent "Disclaimers" to Warden B. Armstrong /OIG, and mailroom. This case is on File. ②

After this incident, I decided to tell my Facilitators to,again campaign on mailroom and retaliation/discrimination by Sgt. Estrada /Reyes/ Williams for Holding and Denying mail strictly because of my ideology. I decided to take action against this, so I reported it to the Brazoria County Sheriff's Dept. by explaining the mailroom was entrapping inmates by allowing drug's to be introduced by mail and STG-intelligence useing mailroom clerk supervisor— "Alexandria Ford" to transport the contraband to specific inmates, and STG would follow on camera,...this was going on since May of 2020. Well, Sheriff didn't come here to investigate, they called Huntsville to report me "whistle blowing" on their corruption Scheme,... Huntsville immediately began convicting all pending cases for contraband in Brazoria County,...and covering up the Statewide corruption scheme,....that was banking on entrapping inmates useing mailrooms, a Federal offense. So, I kept reporting Retaliation/Discrimination to Charles Martin - SCFO attorny representing me,...he said they had tried to Fire him, because, I was sending him evidence of the mailroom retaliation. Warden Bruce Armstrong and Huntsville proceeded to Place me on B-Line-single cell and, continued to Retaliate/discriminate harder by stopping access to Law Library, Grievance, stop my outside support from putting money on my Books, stopped access to Commisary, and it continues today. They literally began trying to Starve me, which is the same Tactic they used to kill or Push the other's to suicide,....the Administration did not know that behind the Misconduct Reporting, I had also reported to FBI/DEA/BOP/ACLU/NAACP/mayor Sylvester Turners Administration/ State representatives - Alma Allen/Ron Reynolds.

(CONTINUED)→

Today is MARCH 26 2020. I have Been Casptible, but still under heavy STATE Repression, No Access to proper NUTRITION on Commisary, my only Financial Supporter is No Longer Allowed to Put Money on my Books, ... By Now, these same people, some have proven guilty by Huntsville of Corruption Tactic's, so they quickly got Removed prior to me Filing this Lawsuit.

Because on 1/11/21 @ approx. 3:10 - 3:50pm on B·Line 2·Row·8 cell, WARDEN B. ARMSTRONG sent His intelligence officers to intimidate me AND steal Legal mail, that Alexandria Ford came to my cell UN escorted, opened Legal Packet, showing camera each piece, before sliding into my cell. Shortly after, the officers I had Reported came to steal the mail by ORDER OF WARDEN BRUCE ARMSTRONG.

I wrote a grievance Twice, AND it was then Blocked, and more Retaliation has ensued, ... Regardless of this PACKET containing "FIRST Amendment Rights Disclaimer. Huntsville has photo's of it, ... For I sent it to my ATTORNEY, ... who I am calling as a witness, as well as. My Facilitator's @ KC-1WOC (BRIANNAIww@gmail.com) "Brianna Peril — Fight Toxic Prisons- "Richard Thomas" helped me Twice get this Administration to Let me make Commisary, ... I only got one, AND only Correspondence.

I am under Heavy Retaliation For Writing about the TDCJ - LOSEING City Contract's by Democrat's AND Mayor Sylvester Turner's Administration AND Sharing it with all of the Inmates. All of THESE EVENT's ARE all on RECORD, Phone calls, GRIEVANCES @ Huntsville's — Executive Services, ... SCFO— AND FBI/DEA Houston Field Office's have my LETTER's AND THE STEP 1's that ARE PART OF THESE STEP 2's. I'VE LEFT PAPER Trail BECAUSE THEY CRANKED UP TORTURE Tactic's AND I have

DEFENDED MYSELF THIS WHOLE TIME, WHICH IS 18 months IN AD. SEG. NOT FOR MISBEHAVING, FOR PRACTICING MY Right To FREE SPEECH, MEDIA, Assembly.

FBI is being INFORMED OF the CONTRABAND because it's proving that OFFICER'S ARE INTENTIONALLY Introducing it to kill people, AND to Disrupt my UNION ORGAN- IZING. Today, AS OF FEB 27, 2020 - HOUSTON BRANCH-IWW AND: TEXAS Local Charter - IWOC is OFFICIALLY FORMED AS OF MARCH 8TH, 2020 but, ACTIVELY Fighting Against, NOT having AIR CONDITION, OR AD. SEG NOT being provided with RESPITE, but INSTEAD Disciplinary Action For Asking FOR it. THESE issues are still being MET with RETALIATION /Discrimination JUST FOR SPEAKing out. I am A FIRM believer that the "PRISON SLAVERY" is brutally upheld, ... by ANY means NECESSARY, million's OF Dollar's worth OF STATE OF the Art FARMing Equipment, Pesticide drops by PLANE, Egg Production , ARE DAILY MONEY MAKing OPERATION's RUN by Inmates who do not get paid, Like myself. I FIGHT FOR EXTRA Food Portions, PEST Control, Plumbing FIXED, better Phone System, A/C FOR WORKER's in Dayrooms, ... AND All ON RECORD, AND I WAS brutally RETALIATED/DISCRIMINATED on FOR FORCing the TDCJ - to DO FOR the inmate. I Do not Plan ON Stopping, AND Neither Do they Feel that my Right's AS A HUMAN MATTER. Psychologically Torturing me , AND RETALIATing on my Anarchist/Abolitionist ideology IS How they Continue to ATTEMPT to BREAK ME.

I have OVER 100 MEMBER/ORGANIZERS ON Darrington I am REPORTING to Facilitators, ... AND All OF THEM ARE being TREATED the Same Now. THAT is why I have To FILE THIS LAWSUIT. THEY ARE STILL TRYing To SILENCE ME IN HUNTSVILLE, ... All VERIFYABLE.

Julie C. Zwug #1961551

To WHOM IT MAY CONCERN,

MAR 2 9 2021

SG/HQ MR

My NAME is "ALEX", — I am an ORGANIZER w/ INDUSTRIAL WORKERS OF THE WORLD — INCARCERATED WORKERS ORGANIZING COMMITTEE. TEXAS LOCAL CHARTER DELEGATE / # X386969. I am Having SOME SERIOUS ISSUES WITH THE STATE OF TEXAS — TDCJ — HUNTSVILLE HQ. THEY have viciously ATTACKED ME, AND USED TORTURE TACTIC'S IN AN ATTEMPT TO BREAK my Spirit, AND BODY, — I am CURRENTLY guilty of EXPOSING A STATEWIDE Corruption Scheme IN MAILROOM'S ACROSS the ENTIRE STATE, — FBI / DEA / BOP / BRAZORIA County SHERIFF'S, — STATE COUNSEL FOR OFFENDERS — Charles MARTIN — ATTORNEY FOR THE STATE REPRESENTING ME IN ONE OF THE CONTRABAND ENTRAPMENT SCHEME'S. CURRENTLY I am being Punished FOR REPORTING 15 SUICIDES UNDER THE CURRENT ADMINISTRATIONS BELT, — I've gotten ONE ASST. WARDEN REMOVED, BUT, ALL TEXAS DEPT. OF MINIMAL JUSTICE DID, WAS GIVE HER A PROMOTION. ANGELA CHEVALIER / BRUCE ARMSTRONG / FREDERICK GOODEN (major) / KURTIC PHARR (major) / MARCUS COOPER (CPT.) ALEXANDRIA FORD / TUNDE AKINSONU / STEPHANIE ARMSTRONG / ONYEWUCHI CHUKWU / JUJU LINCOLN-MOON / BASIL PENNY / PATTIE POLK / EDGAR SANDOVAL / JESSE LOTT'S / RICKEY GARCIA / AND OFFICE OF INSPECTOR GENERAL @ DARRINGTON WERE RUNNING CONTRABAND INTO THE UNIT, TO ENTRAP AND CONVICT INMATES USEING THE BRAZORIA County DA'S ASSISTANCE, — CYNTHIA BRIDGES. NOW, THAT I have EXPOSED THIS, THE STATE HAS WARP SPEEDED A change IN CONTRABAND POLICY.... THE CONTINUOUS TORTURE TACTIC'S ARE COMING OUT OF HUNTSVILLE NOW, BECAUSE OF WHO I am, ... NOT what I DID. AS ALL THE DISCRIMINATION / RETALIATION / DEGREDATION / ENFORCING TRIVIAL DEMANDS / THREATS / INDUCED DEBILITY exhaustion / EXPOSURE TO THE ELEMENTS ARE ALL CLASSIC SLAVE CATCHER TEXAS TRADITIONS FOR TDCJ. THERE'S MUSEUM'S DEDICATED TO THESE ATROCIOUS TACTICS. NOW, I AM ASKING FOR ASSISTANCE, SINCE THE POLITIC IANS ARE NOW AWARE OF MY INTENTIONS TO BRING CHANGE TO TEXAS CRIMINAL JUSTICE. I am # 1 TARGET, AND MY IWW — IWOC MEMBERS ARE BEING CLANDESTINELY BEING ATTACKED BY THESE SAME PPL. HOUSTON FIELD OFFICE FBI / DEA / MAYOR SYLVESTER TURNER'S ADMINISTRATION, STATE REPS — ALMA ALLEN / RON REYNOLD'S HAVE BEEN ADVISED OF THE STATEWIDE CORRUPTION, AND NOW, I AM STILL BEING ATTACKED BY HUNTSVILLE, MY FAMILY CAN'T PUT MONEY ON MY BOOKS, I CAN'T PURCHASE NUTRITION FOR MY IMMUNE — COMPROMISED SELF. ———

I have ASKED THEM TO BE INVESTIGATED AND DISCIPLINARY

CASE, BECAUSE THE PUNISHMENT WAS IMPOSED
IN RETALIATION FOR ANGELO CHEVALIER'S REMOVAL
FROM THIS DISGUSTING OUTDATED AND DILAPIDATED
PRISON PLANTATION. — THIS IS 2021, AND HERE
THE ADMINISTRATION REFUSES TO RE-ROUTE A/C INTO
OUR LIVING AREAS (REC DAY ROOMS). — SO EXPOSURE TO
HARSH WINTER/SUMMER IS NOW A VILE THREAT TO
THE ENTIRE PRISON POPULATION, STATE REFUSES TO
PROVIDE ORGANIC AND SIMPLE SOLUTIONS, AND INSTEAD
OF ANYONE BEING HEARD. THEY ARE HAULED OFF TO ISOLATION
B-LINE — FOR FREE SPEECH. I AM NOT DONE, THERE IS
MORE. PLEASE CONTACT MY FACILITATORS @
(BRIANNAIWW@gmail.com) BRIANNA PERIL is
MY COMRADE IN THIS HORRIBLE STRUGGLE, AND KNOWS
FIRST HAND OF ALL THE ATROCIOUS ACTS.
WHICH ARE STILL HAPPENING. WE NEED SOME
SERIOUS HELP, AND I NEED TO BE CALLED THRU
THE LAW LIBRARY (TDCJ.COM TO REGISTER) AT ANY
PHONE CALL. I HAVE TO GET MY STORY OUT BEFORE THEY
GET OUT OF HAND AND GO TO FAR. THE SUICIDES ARE
THEIR SPECIALTY. CONTACT #'s FOR SERIOUS
COMRADES STANDIN' W/ ME IN SOLIDARITY. (MATT BRODNAX
(BRODNAX13@gmail.com) ALEXIA K. ORNDORFF (akorndorff@
gmail.com)

RESPECTFULLY
SUBMITTED

JULIO A. ZUNIGA
TEXAS LOCAL CHAPTER
IWOC HOUSTON.

MAY 1 1 2021

4/28

**Texas Department of Criminal Justice**

# STEP 2 OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY | |
|---|---|
| Grievance #: | 2021 060 679 |
| UGI Recd Date: | APR 1 3 2021 |
| HQ Recd Date: | APR 1 9 2021 |
| Date Due: | 05-23-2021 |
| Grievance Code: | 304 |
| Investigator ID#: | I0674 |
| Extension Date: | |

Offender Name: Julio A. Zuniga    TDCJ # 1961331

Unit: DR    Housing Assignment: B·2·08 H·2·H

Unit where incident occurred: B-LINE / DARRINGTON

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed*

Give reason for appeal (Be Specific).    *I am dissatisfied with the response at Step 1 because...*

THE REASON WHY I am dissatisfied with This Finding, is because I have WITNESSES that ARE EMPLOYEES OF TDCJ-Huntsville, that will have to speak the truth when under oath. The "THEFT OF MAIL"-PRIVELEGED LEGAL MAIL WAS photographed by The Chief OF SCFO-Huntsville, AND when Chief TRIED To Fire my STATE ISSUE ATTORNEY FOR FURTIVE REASONS — MY ATTORNEY was intelligent enough to ask To see the mail AND CONCLUDED that it WAS IN FACT DIRECTED To Him: Charles MARTIN — ATTORNEY that I REPORTED ALL OF DARRINGTON Administrations ConsTiTuTional violations "DELIBERATE Indifference" / "MALICE" / RETALIATION / DISCRIMINATION / DENIED ACCESS To COURTS AND GRIEVANCE process, ...ALL ON RECORD AND TIMELINED. Asst. WARDEN Villalobos, ...Is NOW Lying on STEP 1, stating the allegations ARE FALSE yet, the VIDEO will show AND witness TESTIMONY will show that "Allegations ARE "TRUE" AND "CORRECT." THE illegal MAIL FRAUD is ContinuEing by MAILROOM ClerK "STEPhanie ARMStrong," RELATIVE OF WARDEN BRUCE ARMStrong, ... NOThing Changes the Fact OF illegal THEFT OF MAIL, JUST because OFFICERS INvOlved got Caught Stealing A "FIRST AMENDMENT RightS DisClaimER" that was in the Envelope That They Stole by Force, BY REQUEST OF THE SENIOR WARDEN BRUCE ARMStrong.
    Physical PROOF I will ASK THE COURTS To SubPOENA AND

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

the Allegations will prove themselves, ... I will send FBI
A RESPONSE COPY OF STEP 1, — AND STEP 2.

Offender Signature: _Julia A. Zuniga — INOC— Houston_   Date: _4/13/21_

Grievance Response:

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Your complaint has been reviewed. There is no evidence to substantiate your allegations. No further action is warranted.\*\*\*

Signature Authority: _Tammy Shelby_   Date: _04/29/2021_

Returned because:   *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate.*

CGO Staff Signature: _____

**OFFICE USE ONLY**

**Initial Submission**           **CGO Initials:** _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

**2nd Submission**           **CGO Initials:** _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

**3rd Submission**           **CGO Initials:** _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

I-128 Back (Revised 11-2010)                    Appendix G



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

OFFICE USE ONLY

Grievance #: 2021055890

UGI Recd Date: MAR 8 2021

HQ Recd Date: MAR 11 2021

Date Due: 4-7

Grievance Code: 400

Investigator ID#: 11312

Extension Date: 5-7

Offender Name: JULIO A. ZUNIGA   TDCJ # #1961551

Unit: DA   Housing Assignment: B.Z08   J 217

Unit where incident occurred: DA

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

Give reason for appeal (Be Specific).   *I am dissatisfied with the response at Step 1 because...*

FIRST, NO EVIDENCE WAS PRESENTED that show's any mail speaking about what I was accused of. I do have an Interview on the Final Straw Radio @ RISEUP.NET (4/23/20) That speak's about wanting to organize and bring forth change; I have a new episode about to be released, Also, I have officially formed the "Industrial Workers of the World - Incarcerated Workers Organising Committee - Texas Local Charter. My access to media, phone zaps, campaigns, direct-action, wild-cat strikes, ect. is in my hands, I can use these tool's as I feel necessary, Especially w/ An Administration that uses/employs corrupt tactic's in disciplinary, and mailroom entrapment scheme's that I have personally reported. OIG, did nothing, so I advised Mayor Turner/State reps/ media/FBI/DEA/BOP/and my facilitators and I am going to the air waves to report further discrimination on my IWW-IWOC members and I. The administration want's a class action lawsuit, they still retaliate on my ideology, and my membership as a member of the IWW. It's still ongoing. In mailroom, in AD. seg area's that are all IWW members, This is still ongoing, my trust fund account is inactive, my people can't put money on my books, so I have to file a lawsuit, you are discriminating/retaliating on who I am, not what I've done. I've been accused of a bogus case, you upheld it, so I will continue to report TDCJ-Huntsville for this mistreatment,

I-128 Front (Revised 11-2010)   YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM   (OVER)

Appendix G

I am DENIED Supplements by MEDICAL, GRIEVANCE, Law Library,
So, You've been Knowing ABOUT THIS FOR a long Time NOW.
OVERTURN MY G5 / give me my LINE 1 / G4 Back.
I'm NOT DESERVING OF THIS Punishment / CRUEL or OTHERWISE.
TEXAS LOCAL Charter - IWOC (HOUSTON BRANCH) IWW

Offender Signature: _Julia G. Zuniga_      Date: _3/5/21_

Grievance Response:

An investigation has been conducted by the Central Grievance Office. Major disciplinary
case #20210085138 has been overturned. It will be at the Warden's discretion as to if the case
will be re-heard. This issue is resolved and requires no further action from this office.

J. Back

Signature Authority: _____X Back_____      Date: ____JUN 0 3 2021____

Returned because:   *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.
☐ 2. Illegible/Incomprehensible.*
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments.*
☐ 5. Malicious use of vulgar, indecent, or physically threatening language.
☐ 6. Inappropriate.*

CGO Staff Signature: _____

**OFFICE USE ONLY**

Initial Submission      CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

**2nd Submission**      CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

**3rd Submission**      CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

     Appendix G

AUG 1 3 2021

7113



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

OFFICE USE ONLY

Grievance #: 2021126942

UCI Recd Date: JUL 2 2021

HQ Recd Date: JUN 09 2021

Date Due: 8-11-21

Grievance Code: 307

Investigator ID#: I0674

Extension Date:

Offender Name: Julio (A) Zuniga   TDCJ # 1961551

Unit: DIA   Housing Assignment: JD217B

Unit where incident occurred: DIA

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

---

**Give reason for appeal (Be Specific).** I am dissatisfied with the response at Step 1 because...

WILLIE RADCLIFFE / MOISES VILLALOBOS/ CAPTAIN LANCE / MAJOR GOODEN/ MAJOR COOPER / LT. LUCHS / LT. LOTT / MRS. WAGNER ARE STILL IN DENIAL ABOUT THEIR OWN CORRUPTION AND CONSPIRING TO COVER-UP EACH OTHER'S TRACKS Administratively... WILLIE RADCLIFFE IS GUILTY OF DENYING IWOC-LOCAL 613 MEMBERS ACCESS TO THE COURTS, BY USEING THE USUAL PUPPET, MRS. WAGNER TO BLOCK ME, AND OTHERS WHO HAVE TESTED POSITIVE FOR H-Pylori + the COURTS, ... IWOC WILL FILE A CLASS ACTION FOR THIS REASON REGARDLESS OF WILLIE'S TANTRUMS, OR MOISES VILLALOBOS, ... THE CONSTITUTIONAL VIOLATIONS SUPERCEDE ANYTHING THEY do, AND SINCE WE CAN FOLLOW THEIR DENIALS TO RESPITE AREAS, INFESTATION AND WATER CONTAMINATION BY ALLOWING CAPTAIN LANCE TO LET THE CHOW HALL GO UNSANITIZED OR SPRAYED FOR ROACHES FOR MONTHS IN RETALIATION FOR A UNIT THAT HAS ORGANIZED AGAINST these TACTICS BY PREDICTABLE SLAVE CATCHERS, ... AND PEON WARDENS, THIS IS A "SAFETY HAZARD" INTENTIONALLY CAUSED by ADMINISTRATION, ... THAT CAUSED THE DEATH OF INMATE "JAMAL WEBER" AFTER HE TESTED POSITIVE FOR H-pylori. MAILROOM IS STILL PUMPING DOPE into the UNIT, AND MORE FLOURWAY IS SPILLED than PEST CONTROL in the WORKER'S FEEDING AREAS, THERE IS NO INVESTIGATION going ON BY ASST. WARDEN RADCLIFFE because HE is CONSPIRING with BAD ACTORS to COVER UP the DIRTY

---

I-128 Front (Revised 11-2010)         YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM         (OVER)

Appendix G

"SAFETY HAZARDS" / "CONTRABAND ENTRAPMENT BY SGT. WILLIAMS / SANDOVAL
AND OIG'S ON THIS UNIT, JUST AS IT happened IN JAN - FEBRUARY 2020.
AGAIN, "DELIBERATE Indifference" / "MALICE" / "Conspiring By A NEW
SET OF BAD APPLE'S IS THE only SOLUTION TDCJ has brought To
DARRINGTON, AND BY Keeping those Found guilty get PROMOTED.

Offender Signature: _Julio A. Zuniga_                    Date: _7 · 1 · 21_

**Grievance Response:**

*        *        *        *        *        *        *        *        *        *        *        *

Your grievance has been reviewed.  You have raised an issue in your Step 2 that was not
addressed in your Step 1 grievance.  No action is warranted.  ***

Signature Authority: _Tammy Shelby_                    Date: _07|15|2021_

Returned because:    *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate.*

CGO Staff Signature: _____

**OFFICE USE ONLY**

Initial Submission                    CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

2nd Submission                    CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

3rd Submission                    CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____



PROJECT TO RESHAPE
**RESTRICTIVE HOUSING**

The prison setting imposes greater than normal restrictions on liberty, privacy, and communication. As a result, the prison comes under greater legal scrutiny regarding extent of the restrictions and deprivations of those restrictions and deprivations. Within the prison setting, the placement of inmates in restrictive housing or administrative segregation generates even greater judicial scrutiny due to the level of restriction, reasonableness of the placement and the indeterminate length of the segregation.  Even with the proper policies in place, the conditions and programming in restrictive housing require careful review and attention for any correctional facility. In the past few decades, prisoners and prisoner right advocates have successfully challenged many departments on the use of restrictive housing. The following presents a brief overview of the areas in which departments have faced legal challenges.

## First Amendment

*"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances."*

Challenges on First Amendment grounds include:

- Restrictions to religious expression
- Restrictions to religious services including group participation
- Restrictions to possessing religious materials
- Limitations adhering to religious diets
- Denial of access to reading materials
- Restrictions on access to outside communication including personal contacts and the press
- Restrictions on visitation

## Fourth Amendment

*"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized*

The expectation of privacy inherent in whether a search is reasonable or not is significantly reduced in the prison environment.  This reduced expectation of privacy, and the reasonableness of a search of an inmate's property is expanded in the administrative segregation setting due to safety and security concerns and therefore subject to greater scrutiny by the court.



**CRIME AND JUSTICE INSTITUTE**

This project was supported by Grant No. 2013-DP-BX-K011 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. Points of view or opinions in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.



Challenges on Fourth Amendment grounds include:

- Cross-gender supervision searches
- Denial of confidentiality such as during medical or mental health examinations or interviews
- Bodily searches and the use of medical technology

## Sixth Amendment

*"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."*

Challenges on Sixth Amendment grounds frequently relate to and offender's due process protections and ability to present a defense to the accusations. Challenges include:
- Limitations on the notice and the ability to obtain evidence
- Restrictions to accessing counsel
- Limited access to law libraries to conduct legal research

## Eighth Amendment

*"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."*

Two conditions are used to determine grounds for an Eighth Amendment claim:
(1)     The conditions are "sufficiently serious", meaning that the inmate is denied "the minimal civilized measure of life's necessities"[1] and
(2)     Institutional staff must be "deliberately indifferent" to the threat posed by the conditions, in that they knowingly disregarded the health and safety risks posed to the inmate.[2]

Challenges on Eighth Amendment grounds include:
- Use of force procedures
- Limited access to medical and mental health care
- Physical conditions of confinement

---

[1] Rhodes v. Chapman, 452 U.S. 337, 347 (1981)
[2] Farmer v. Brennan, 511 U.S. 825, 834 (1994)



**CRIME AND JUSTICE INSTITUTE**

IWW—IWOC DELEGATE IS ACTIVELY INVOLVED WITH END AD SEG TX@GMAIL.COM
(Brittany Robertson)



## A BLUEPRINT FOR ENDING SOLITARY CONFINEMENT BY THE FEDERAL GOVERNMENT

**THE FEDERAL ANTI-SOLITARY TASKFORCE**          **JUNE 2021**



# A Blueprint for Ending Solitary Confinement by the Federal Government

Currently, over **10,000 people** on any given day are in some form of solitary confinement in federal Bureau of Prisons facilities, representing nearly 8% of the total federal prison population. This is a substantially higher percentage than the national average in state prison systems and even higher than in the federal BOP a decade ago before reductions were made under the Obama administration.

**Solitary confinement is torture.** It causes immense suffering and devastating mental, physical, and emotional harm. In federal custody, as in state and local jurisdictions across the country, solitary and other forms of restrictive housing and practices are disproportionately inflicted on Black people, Latinx people, Native people, and other people of color, as well as transgender and gender non-conforming people, people with mental health needs, and young people.

Solitary has directly caused the deaths of far too many people, and it has increased violence and harm in prisons, detention facilities, and outside communities. Evidence shows that in fact the opposite of solitary confinement - providing people full days out-of-cell with pro-social engagement and programming - actually increases safety.

President Joe Biden and Vice President Kamala Harris both committed to ending the practice of solitary confinement in their 2020 campaigns and policy platforms. Thanks to a growing movement against solitary across the country, these commitments were shared widely among other leading Democratic presidential candidates, including Senators Elizabeth Warren, Bernie Sanders, and Cory Booker.

At the same time, states and localities across the country are restricting the use of solitary across partisan lines, and multiple local and state jurisdictions are moving toward fully ending solitary. In 2021, 70 pieces of legislation were filed across 32 states to end some aspect of solitary confinement in state prisons and jails.

## A Blueprint for Ending Solitary Confinement by the Federal Government

Both the Biden-Harris Administration and the U.S. Congress can and should lead the way in ending this inhumane, harmful, and counterproductive practice in federal jurisdictions. This document provides a Blueprint for how the U.S. government can use executive, administrative, and legislative action to end the torture of prolonged solitary confinement in federal custody, including in Bureau of Prisons facilities, U.S. Marshals Service facilities, and immigration detention.

**Specifically, the U.S. government must:**

**1 End all forms of solitary confinement** in all carceral nations, other than lock-ins, measured at most in hours to de-escalate emergency situation, involving imminent serious physical injury, or for medical quarantine, with appropriate physical distance, and with oversight by medical staff

**2 Ensure that all separation/alternatives to solitary, regardless of what they are called, are the opposite of solitary** with access to all day out of cell (at least 14 hours) and congregate, meaningful programming and activities (at least 7 hours) without restraints and with at least several other people in group spaces, consistent with engagement in true engagement.

**3 Enhance due process protections** by up-to-date decision makers and representation at hearings, meaningful, compliant, at will with any organizational or legal requirement standard or neutral or anti-representational, and imposes a minimum limit on any seven-day period.

**4 Create oversight and enforcement mechanisms,** including requiring a greater role of action, transformative collective, independent oversight by an official person, media, and community stakeholders, and incentives for states and facilities to end solitary, and reduce use and make effective intervention.

## A Blueprint for Ending Solitary Confinement by the Federal Government

While the specific proposals in this Blueprint are designed for federal custody, the key mechanisms can also provide a framework for ending solitary confinement in state and local jurisdictions across the country as well.

## The Specific Proposals and Explanations

### Proposal 1

**End solitary confinement** in all federal custody, other than a) in emergency situations involving imminent serious physical injury, measured in hours rather than days, and with repeated engagement during that time or b) for medical quarantine in units overseen by medical staff, with comparable to general population services, phone calls, emails, programming with appropriate physical distance, telecommunication, and meaningful human engagement with appropriate physical distance.

Solitary confinement should be defined as any amount of involuntary lock-in other than 8 hours a night for sleep and 2 hours during the day for count and other operations of the facility, regardless of the name of the unit or status a person is in.

Beyond those time limits, involuntary lock-ins should only occur in an emergency situation as a last resort to de-escalate immediate conflict that has resulted in serious physical injury or makes imminent injury likely, and for as short a time as necessary to de-escalate such conflict and not to exceed four hours total immediately following such conflict, with staff rounding at least every 15 minutes and staff engagement at least every hour. No one should be held in such confinement for more than four hours total in any 24-hour period, nor more than 12 hours total in any seven day period.

Even involuntary lock-ins measured in hours should be prohibited for protected special populations because of the particular harm they can face in isolation, including people 25 or younger, 55 or older, with mental health needs, with medical conditions, with disabilities, who are LGBTI, and who are pregnant or new mothers.

A Blueprint for Ending Solitary Confinement by the Federal Government

## Proposal 2

**Ensure that all separation from the general population or alternatives to solitary, regardless of what they are called and including any and all forms of restrictive housing, are the opposite of solitary,** with full days of out-of-cell congregate time (at least 14 hours) and opportunities for congregate programming and activities (at least seven hours) aimed at addressing the reasons for separation from the general population, without restraints and with at least several other people in group spaces conducive to meaningful human engagement. The definition of restrictive housing should encompass all forms of housing that is more restrictive in any way than the general facility population in terms of hours out-of-cell, programming, services, congregate engagement with other people, visits, communications, amenities, or any other aspect of daily living, in order to avoid 'solitary by another name' and to actually improve safety.

Also, restraints should generally be prohibited to ensure people are not chained during programming, and there should be no restrictions on communications with individuals, attorneys, or the news media, or any other Special Administrative Measures (a relatively new practice that has been abused).

## Explanation for Proposal 2:

Addressing the root causes of harmful behaviors requires engagement, not isolation. There can be separation from the general facility population when needed without isolation. There are no safety or other benefits to restricting people's out-of-cell time, beyond immediate emergency responses measured in hours. But such restrictions on out-of-cell time can cause extreme suffering, devastating harm, and even death.

Evidence shows that what works to reduce violence and improve safety is the opposite of solitary, with opportunities for pro-social programming and engagement-based approaches. Examples like the Resolve to Stop Violence Project in San Francisco jails, which involves full days of out-of-cell congregate programming, show dramatic reductions in violence in jails and outside communities after people return home, as well as financial savings.

(continue on next page)



---

A Blueprint for Ending Solitary Confinement by the Federal Government

## Explanation for Proposal 1

Restricting solitary confinement to situations measured in hours draws from best practices in youth and mental health settings, including Colorado youth detention policies, NYC secure detention youth facilities, and other model youth policies, as well as mental health models where seclusion can be measured even in minutes and involve engagement during seclusion.

In incarceration settings, Allegheny County (includes Pittsburgh) just banned solitary confinement (although with a definition of solitary that could be strengthened), Chicago, while still a work in progress, is in the process of attempting to end solitary entirely administratively, New York City while also still a work in progress, is on the brink of ending solitary entirely administratively and legislatively, with alternatives involving full days out-of-cell and congregate programming. Connecticut has a bill with growing momentum that would nearly end solitary entirely other than in emergencies, and Virginia and Maine, as well as other states, have proposed bills that would ban solitary as well. New York State recently enacted legislation that would end all prolonged solitary beyond 15 days, ban solitary entirely in many circumstances, and ensure people in alternatives have at least seven hours of out-of-cell congregate programming and activities.

**Solitary causes people to engage in self-mutilation and suicide. It causes heart disease. It causes anxiety, depression, psychosis. It leads people to deteriorate mentally and physically. Research shows even one or two days of solitary leads to significantly heightened risk of death by accident, suicide, violence, overdose, and other causes.**

Of note, double ceiling - where two people are locked in the same cell - still amounts to solitary confinement and has just as harmful consequences, and sometimes even worse and deadly consequences.

**Moreover, solitary makes prisons, detention facilities, and outside communities less safe.** There is no evidence that restricting people's out-of-cell time improves safety in any way. On the contrary, there is ample evidence showing that solitary confinement causes people to mentally and physically deteriorate, making it more likely a person will act in a harmful manner. There is also evidence (see next page) **that the best way to reduce violence is to adopt policies and practices that are the opposite of solitary, with full days of out-of-cell time and program-based and engagement-based interventions.**

A Blueprint for Ending Solitary Confinement by the Federal Government

## Explanation for Proposal 2 (cont)

Similarly, the Merle Cooper program in New York State was the opposite of solitary - with full days out-of-cell, programming, and the ability to earn the right to not be locked in at night - and had positive outcomes on safety and was praised by staff administrators, and participants. The Clinical Alternatives to Punitive Segregation (CAPS) program in the New York City jails - an alternative to solitary that is based on therapeutic approaches rather than punitive ones or isolation - has shown positive outcomes for reducing violence and self-injury. Of note, in Colorado "corrections officers who had initially opposed [limits on solitary] changed their minds after they began to see positive results."

According to Dr. James Gilligan, who is the former director of Massachusetts prison mental health services and who has studied violence for decades, in his 2001 book Preventing Violence: "Far from preventing violence, punishment is the most powerful stimulus to violent behavior that we have yet discovered. Punishment does not prevent violence, it causes it. In addition to being a form of it." Recalling his experience observing an incarceration setting, Dr. Gilligan wrote.

**"The more violent a person was, the more severely he would be punished, and the more severely he was punished, the more violent he would become. This endless, mutually self-defeating vicious circle kept both people incarcerated and prison officers in a chronic state of war with each other - which was the opposite of what they both said they wanted."**

Under the above Proposal 1 in this Blueprint, if someone engages in violence, they can immediately be locked in for a period measured in hours in order to address the immediate situation. After that immediate period, people can still be separated from the general population. **What matters is the nature of that separation. Rather than isolation that is known to increase the likelihood of violence, people who are separated must be in environments that evidence shows are better suited for actually reducing and preventing violence.**

---

A Blueprint for Ending Solitary Confinement by the Federal Government

## Proposal 3

**Enhance due process protections,** using neutral decision-makers and a right to representation at hearings to ensure meaningful review of allegations that can result in separation or alternatives, restricting conduct that can result in separation or alternatives to the most egregious conduct in need of an intensive intervention, and imposing strict time limits on separation or alternatives to ensure that people are not warehoused in abusive environments.

## Explanation for Proposal 3:

The processes that result in solitary confinement, and other forms of restrictive housing are often arbitrary, unfair, and infused with racial and other bias. People facing the prospect of being separated from the general facility population should have the right to representation, including a right to appointed counsel, and should have a hearing before a neutral decision-maker who is not employed by the Bureau of Prisons, the U.S. Marshals Service, Department of Homeland Security, or other federal agencies with people in their care and custody. Other jurisdictions, such as Washington, D.C. and Massachusetts, provide for representation. In addition, people in custody and any attorney of record should receive proper and timely notice of the charges against them and all relevant evidence, and any refusal by a person in custody to attend such hearings should be videotaped and made part of the record. A failure to provide such notice or to enter into the record videotaped evidence of an alleged 'refusal to attend by a person in custody should constitute a procedural violation warranting dismissal.

There also must be strict time limits on how long someone can remain in an alternative to solitary, including a maximum of 60 days in any six month period if the conditions are as outlined above and shorter if the out-of-cell and programming requirements do not meet those proposed. Such time limits are essential to ensure that people do not get warehoused in units that may become abusive.

A Blueprint for Ending Solitary Confinement by the Federal Government

## Proposal 4

**Create oversight and enforcement mechanisms,** including ensuring a private cause of action, mandatory data collection, independent oversight by an Ombudsperson, media, and community stakeholders, and incentives for states and localities to end solitary and create safer and more effective interventions.

Including a private cause of action is necessary to ensure that people in custody who are wrongfully placed in solitary or restrictive housing and severely injured in violation of any new law restricting solitary and/or the Constitution are not precluded from having the ability to sue.

**The Bureau of Justice Statistics should immediately begin collecting disaggregated data on the use of solitary confinement from all federal and juvenile facilities, as well as state prisons and local jails, and begin producing a public report at least annually.**

### Explanation for Proposal 4:

Specifically related to the private cause of action, people in prison have long used "Bivens actions" to seek money damages for constitutional violations in federal prison, but ever since the Supreme Court greatly restricted the availability of Bivens actions in Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), many people challenging constitutional violations by federal prison guards or wardens have had their claims dismissed for lack of a cause of action. One example in the context of solitary is Bistrian v. Levy, 912 F.3d 79 (3d Cir. 2018) in which a pretrial detainee at a federal facility challenged his placement in solitary on and off over a decade, including for a year at a time, sometimes in retaliation for protected speech or with no procedural protections, and the court dismissed his constitutional claims for lack of a cause of action.

**Any federal legislation ending solitary must create a cause of action, or else people who are placed in solitary and severely injured in violation of the new law would have no ability to seek compensation, even if the violation also amounts to a violation of the Constitution.**

---

A Blueprint for Ending Solitary Confinement by the Federal Government

### Explanation for Proposal 4 (cont):

Inclusion of an explicit cause of action is especially essential here because if Congress acts in a particular context and does not include a private damages remedy, the Supreme Court has instructed the courts to interpret this as an indication that Congress does not think constitutional violations in that context are deserving of a damages remedy. For example, in Dudley v. United States, No. 4:19-CV-517-O, 2020 WL 532338 (N.D. Tex. Feb. 3, 2020) a woman incarcerated sought damages for sexual assault by her case manager and the court ruled that Congressional action in passing the Prison Rape Elimination Act without including a private cause of action counseled against the judiciary allowing a damages action to proceed. In other words, if any anti-solitary federal legislation passes without inclusion of a private damages remedy, it will affirmatively interfere with the ability of people in custody to seek compensation for injuries stemming from their placement in solitary.

**In addition to the private cause of action, there should be extensive public reporting requirements on the use of solitary confinement and restrictive housing as well as multiple oversight mechanisms to ensure effective implementation.**

Enhanced media access would provide the greatest mechanisms for oversight by the general public. An independent Ombudsperson with unfettered access to facilities and confidential communications would allow for meaningful mechanisms for people incarcerated to raise concerns, and federal agencies should be required to implement remedial action plans in response to Ombudsperson recommendations. A designated community oversight body should also be created with the ability to make unannounced visits with unfettered access to every area of every facility, and have recommendations that require a remedial action plan. This oversight body can be comprised of people who have lived through solitary, people who have had loved ones in solitary or lost loved ones because of solitary, faith leaders, medical and mental health professionals, civil rights and human rights advocates, and other community leaders.

With respect to incentivizing states and localities, the federal government should tie the continued expenditure of existing justice-related funding streams to requirements that states and localities adopt mechanisms outlined in this Blueprint to end solitary confinement and create alternatives that are the opposite of solitary with full days out-of-cell and access to congregate and meaningful programs and activities.

A Blueprint for Ending Solitary Confinement by the Federal Government

## CONCLUSION

There is a growing movement around the country to end or restrict solitary confinement. The proposals outlined in this Blueprint draw from current best practices and the growing body of state and local legislation and policies that has emerged in recent years. The current moment presents an opportunity for the federal government to truly lead the way by ending solitary confinement, other than in extreme circumstances and measured in hours not days, and create incentives for states and localities to do the same.

**President Biden and Vice President Harris have pledged to end solitary confinement,** and Senator Durbin and many others in the U.S. Congress have worked for years to end this torturous practice. Now is the time for the administration and the U.S. Congress to implement this Blueprint through executive, administrative, and legislative action in order to end these harmful and unsafe practices, promote racial justice, and uphold the basic human dignity that confers the rights of all to be free from torture.

### The Federal Anti-Solitary Taskforce

*Principal Conveners*
American Civil Liberties Union
Center for Constitutional Rights
#HALTsolitary Campaign
National Religious Campaign Against Torture
Unlock the Box Campaign
Vera Institute of Justice

The Federal Anti-Solitary Taskforce (FAST) is working to fully end solitary confinement in federal prisons and detention facilities (and end solitary in states, as well). The Taskforce is comprised of civil rights, human rights, faith, and health organizations and leaders, including people who have survived solitary confinement, people who have had family members in solitary confinement, and their allies. Members of the Taskforce have been working to end solitary confinement across the country and have come together to push for an end to solitary confinement federally.

**For more information, contact:**
**jsandoval@unlocktheboxcampaign.org**

*COMPLAINANT*

_____

_____

Telephone#_____

email:_____

*ON BEHALF OF OFFENDER:

_Joshua Jennings_

TDC#_____

RE: "CITIZEN COMPLAINT" *ADMINISTRATION SEGREGATION HOUSING: as of AUG 2019 AD SEG IN TX has b-
een SUPERCEDED TO "RESTRICTIVE HOUSING".

TO WHOM IT MAY CONCER:

I, _Joshua Jennings_     am a citizen of The U.S.A. & IM A RESIDENT AND TAX PAYER OF THE
STATE OF TEXAS.

I am filing this COMPLAINT Pursuant to THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE (TDCJ). This "
"COMPLAINT" concerns the UNLAWFUL Treatment Presently being imposed on OFFENDERS IN AD-SEG/
RESTRICTIVE HOUSING.
We will SHOW the CONTRADICTIVE MISSION STATEMENT (TDCJ) PROCLAIMS TO ABIDE & FOLLOW (TX.GOV.
CODE § 494.001, 493.004, 493.016).

### FACTS OF COMPLAINT

For DECADES, TDCJ has used Administration Isolation on certain OFFENDERS. The United States
Supreme Courts have found through various CASES, SEGREGATING INMATES IS "UNCONSTITUTIONAL".
These Offender's that are STUCK in AD SEG, are deprived of so many BASIC NEEDS. Below you will
find a LIST of such deprivations which POLICY MAKERS have been SILENTLY acknowledging BUT YET
obviously "OVERLOOKING.
Such DEPRIVATIONS has EXTREME SUBSTANCIAL "RISK", of serious harm to his "HEALTH & SAFETY". Eve-
n more so, a CRUCIAL PSYCHOLOGICAL HARM.

Based in:

### TX.GOV. CODES : Title 4, Executive Branch, Inmate Welfare, CH.501 .

The listed below Tx.Gov. Codes: Were IMPLEMENTED BY TX LEGISLATION INTO LAW. But yet, TDCJ mer-
ely re-words THESE LAWS and practice them at their convenience.

As a TX TAX PAYER, I am "CONCERNED"- and realize I and Millions of OTHER TX CITIZENS have been
mislead/decieved to believe otherwise. How our HARD EARNED TAX MONEY is being used.

When in fact, TDCJ has SILENTLY BEEN "KILLING" SO MANY OFFENDERS BY THE ENFORCEMENT OF THESE AD
SEG (SEGREGATION) PRACTICES/RULES.

*** THIS IS AN OUTCRY TO OUR POLICY MAKERS ***

_____

_____

(1)

*** ADMINISTRATION SEGREGATION ***

AUTHORITY: ARTICLE 493.004 and CHAPTER 501, TEXAS GOVERNMENT CODE.
SUPERSEDES: AD-03.50  (Rev.5) February 2, 1983.

ADMINISTRATION SEGREGATION PLAN, AUGUST 1, 1995.

**\* NOW: RE-NAMED TO : "RESTRICTIVE HOUSING PLAN", (superseded from AD SEG PLAN of Aug 1,1995.**

### RESTRICTIVE HOUSING (AD SEG) FOR TX OFFENDERS, AUG 2019.

**If you read BOTH "PLAN's", you will se TDCJ MERELY RE-NAMED AD SEG to a more friendly wording to RESTRICTIVE HOUSING.**

\* Restrictive Housing Plan of Aug. 2019 : Clearly FORBIDS: **THE USE OF RESTRICTIVE HOUSING FOR "PUNITIVE PURPOSES."**

Through an HONEST "INVESTIGATION" on every TDCJ Unit that HOLDS "RESTRICTIVE HOUSING (AD SEG) OFFENDERS. You will "WITNESS" ,its harmful actions/practices. As AD SEG is merely a CONTINUED practice of PUNISHMENT.

### 1) . TX.GOV. CODE § 501.001 : DISCRIMINATION AGAINST INMATES IS PROHIBITED:

**The Institutional Division and the DIRECTOR of the Institutional Division** may NOT DISCRI-MINATE against an inmate on the basis of the inmate's sex,race,color,creed,or national o-rgin.

**\*CONTRADICTION:** As TDCJ **CONTINUALLY "PRACTICE'S" AND DISCRIMINATES "DAILY".** By ther mere fact of repeatedly USING (AD SEG) as a PUNISHING TACTIC.

With an OPEN RECORD  "SURVEY", you will witness this ABUSIVE PRACTICE.

The "MAJORITY OF RESTRICTIVE HOUSING OFFENDERS IN TEXAS? are what they have cAtegorized as (STG) OFFENDERS, which is to say :SECURITY THREAT GROUPS.

Most of these STG OFFENDERS have been DISCIPLINARY free for DECADES. Most are NOT PROBLEMATIC OFFENDERS AT ALL! Some were confined merely by "HEARSAY EVIDENCE".

TDCJ came up with a supposed SOLUTION: By offering these **STG OFFENDERS A WAY OUT OF ADMINISTR-ATION SEGREGATION. Which is to say: They have been utilizing OUR TAX PAYERS MONEY BY STARTING/ FUNDING A PROGRAM CALLED GRAD ( Gang Renouncement and Disassociation).**

\*\*\* What TDCJ has **NEVER REVEALED TO THE TAX PAYERS  IS AS FOLLOWS;**

GRAD requires prisoners to "divulge secret information about the gang" Upon COMPLETION of GRAD prisoners MUST FIRST AGREE TO SIGN A WAIVER (claiming TDCJ is NOT liable for any potential **injury or DEATH to the prisoner.) Before his RELEASE INTO General Population. TDCJ has acted with DELIBERATE INDIFFRENCE by HELPING** to orchestrate this DEATHLY RISK, to these GRAD partic-ipants. In OTHER WORDS, give US(TDCJ) Secret Information of this gang your associated to and we will release YOU out of AD SEG into General Population. BUT WAIT---- before we do, SIGN this WAIVER so we are NOT held accountable.Encase you are injured,KILLED etc, by this gang you div-ulged secret information on.

Signing this **WAIVER assure's (TDCJ)** will not be **LIABLE** and facing lawsuits for placing your **LIFE IN HARMS WAY.**
If this gang **RETALIATES ON YOUR FAMILY MEMBERS** OUT THERE IN THE FREE WORLD, ohh well that is N-OT our concern.
As Tax Payers, that is what you have been part of as well (GRAD program must be funded, no?) for years TDCJ has been manipulating Tax Payers Money, as well Falsifying **Government Records/D-ocuments.**
TDCJ Officials agree, "an individual who divulges secret information about his gang might be a TARGET of violence by fellow gang members. **see: Adams   V.   Perez**, 331 F.3d 508 (5th Cir.2003) also:  **Wilkinson   V.   Austin, 125 S.C.T 2384,2397 (2005) " (testifying,or otherwise informing on gang activities can invite one's own death sentence)."**

Recent reports show that the population in Texas 'solitary-confinement(ad seg)' cells is disproportionately hispanic. **Hispanics compromise over 50 percent of the solitary confinement population,** even though they make up only 32 percent of the General Population.(Texas reported large percentage of prisoners in Administration Segregation: about half ( 51.2% or 3,141 of 6,131 prisoners in Texas) of each jurisdiction, male administrative segregation population were hispanic; Texas reported that 34% **(46,885 of 138,153 prisoners)** of its general population was Hispanic, and that **the male administrative Segregation population included 17.3% more Hispanic** men than the male custodial population.)

TDCJ SILENT Mission for these STG Offenders ; DEBRIEF OR DIE IN AD-SEG.

**NON-STG OFFENDERS:** Those that are placed in AD SEG for Disciplinary Purposes are very likely to be left in Administration Segregation for LONGER TERMS than required, why?? What Policy Makers overlook is the **PSYCHOLOGICAL AFFECT** Administration Segregation has on the HUMAN BRAIN. Being placed in ad seg is a **PSYCHOLOGICAL BATTLEFIELD,** even more so for MANY OFFENDERS that fall VIC-TI M to these TRAPPED CELLS. To the point of committing suicide, or merely distinguishing fancy-sy from "REALITY".

## WHAT ARE THE HEALTH/MENTAL RISK IN AD SEG??

Based on the TDCJ (RESTRICTIVE HOUSING PLAN) it CLEARLY & ADMITTEDLY STATES:
**Offenders in extended restrictive housing may develope symptoms of acute anxiety or OTHER MENTAL HEALTH ISSUES.**

### *TO DEFINE IT MORE FACTUALLY & PROFESSIONAL:

**Researchers have demonstrated that prolonged solitary confinement causes a persistent and hei-**ghtened state of anxiety and nervousness, headaches, insomnia , lethargy, heart palpi-tations, and fear of impeding nervous breakdowns, other affects include obsessive ruminations, confused thought processes, in an over sensicivity to stimuli irrational anger, **social withdra-wal,hallucinations, violent fantasies, emotional flatness,mood swings, (chronic depression),** f-eeling over all deterioration as well as suicidal tendecies, individuals in prolonged soli-tary confinement frequently fear that they will lose control of their anger, and lash out at TDC Staff and be furtherly Disciplined.
***All of the above and more is well DOCUMENTED by social scientist and various EXPERTS.**

## ** QUESTION MY DEAR POLICY LEGISLATIVE MAKERS?

I have defined the PSYCHOLOGICAL AFFECTS.
### SO WHAT ARE THE ACTUAL PHYSICAL HARMS??

As a tax payer, I am concerned as it is evident BY THE USE/PRACTICE of LONG TERM SEGREGATION & COST MORE for housing & medical treatment and so forth, no?
IF TDCJ is truly aware(as they have admitted to such psychological trauma this isolation causes) WHY IS TEXAS STILL USING THIS LONG TERM ISOLATION PRACTICE??????

## FURTHER DISCRIMINATION PRACTICES:

A) Discriminating against AD-SEG Offenders by ONLY giving them (1) , 5 minute phone call every 90 days (IF staff is available to conduct ESCORTS to a phone line in Administration Office). Collect- call on Unit phone line. Which OVERLY CHARGES Offenders loved ones. Which is to say, a 5 MINUTE call will end up costing the loved one **$16.99** under legacy phone Company.
~~THIS THIS NOT DISCRIMINATION~~
When in fact General Population Offenders use of the (O.T.S.) -Offender telephone System ONLY CHARGES General Population Offenders **6¢ a minute, IS THIS NOT DISCRIMINATION??**

### * Suggestion/Solution:

The O.T.S. system general population offenders use. Is already a SECURED phone line/system for PENAL SECURITY/SAFETY CONCERNS. Therefore installing an O.T.S. phone line and giving access to this SECURED LINE to Restrictive Housing( AD SEG) Offenders would NOT be complicated. Of course ONLY A.R. Offenders that QUALIFY would get access to these phones. 1.It would eliminate the use of STAFF ESCORTS. 2.It would ELIMINATE such OVERLY CHARGING($16/ PRICE GOUGING( $16.99 for a 5 minute phone call). 3. Offenders would surely maintain a GOOD CONDUCT knowing, access to such phone PRIVILEGE would bring them closer/contact to their children,family and friends. A VERY POSITIVE PSYCHOLOGICAL AFFECT.

B) Discriminating on AD-SEG OFFENDERS ACCESS TO T.V.(audio & visual stimulation):

The ONLY AD-SEG Offenders that are allowed to view T.V. are those that sign up to the Mental AD-SEG programs TDCJ ( recently started 2014, based on a new Legislative Bill).The Mental Health Therapeutic "DIVERSION" Programs (located ONLY in 2 ad-seg setting Units- Michaels & Hugh Unit) LIMITED SPACING/HOUSING. YOU must meet critiria/qualifications in order for Psych Department to ACCEPT you to such programs (limited space/housing HAS REFUSED ACCEPTANCE TO MANY OFFENDERS). In other words, if you are NOT on their psych LOG/FILE or a Psych patient you cannot participate in this PROGRAM to see T.V.. The REST of AD SEG OFFENDERS are left, to stare at their cell wall's and eventually LOOSE THEIR MINDS!!

### * Suggestion/Solution:

It's a Scientific FACT: T.V. (audio & visual stimulation) viewing has POSITIVE STIMULATIVE EFFECT TO THE HUMAN BRAIN. As it trigger's an impulsive reaction to the brain. Which is to say: MOTION produced by such (impulsive reaction) a wave of excitation transmits through the brains tissues, especially nerve fibers and muscles that result in PSYCHOLOGICAL ACTIVITY I-NHIBITION.
Why does TDCJ "NOT SELL" T.V.'s OR PLACE ONE IN AD-SEG DAYROOMS???
This PRACTICE (ad -seg offenders had a T.V. in each dayroom). Before the Administration Seg-regation Plan of August 1, 1995 was implemented.

TDCJ chose to supersed this PLAN (Aug 1, 1995) , which BRAUGHT a WHOLE PUNITIVE CHANGE TO A-D-SEG LIVING CONDITIONS.
* REMOVAL OF ALL AUDIO & VISUAL STIMULATION (T.V.) FOR SEG OFFENDERS.

* REMOVAL OF ALL EDUCATION PROGRAMS FOR SEG OFFENDERS.

* REMOVAL OF GROUP RECREATION FOR ALL SEG OFFENDERS.

(4)

It became a more "**PUNITIVE PRACTICE**", even the use of chemical agents were implemented.

**\* SOLUTION:**

Give AD-SEG Offenders access to T.V. as ALL OTHER OFFENDERS. This SUBJECT is "NOXT NEW"to policy makers. For year's many citizens have Initiated these discussions to TDCJ officials.

As it is; Technology is so ADVANCED, there are already COMPANIES THAT SELL SECURED APPLIANCES TO MANY PRISONS ALL OVER THE UNITED STATES.

### \*\*\* TDCJ HAS BEEN BREAKING FAMILIES AND RELATIONSHIPS APART, BY AD-SEG PRACTICE \*\*\*

OFFENDER'S INCOMING & OUTGOING MAIL: BECOMING A MAJOR PROBLEM;

The following QUOTED words come from a MASS COMPLAINE, to The JAMES. V.ALLRED UNIT ADMINISTRAT-ION, BY A MASS COUNT OF AD SEG OFFENDERS.
Served to Administration: To Wardens on down
AUG 2019: QUOTE- (D) Mailroom/**incoming & outgoing correspondence**/ Jpays; YOU ALL have been aware of mail taking 7 to 14 days or longer(Snail Mail). We have been made aware that you all have be mailing letters yourselaves and the problem lies in the IOWA PARK, TK. POST OFFICE.

Now jpay's are advertised as coming to inmates within 24 hours, except when sent on Friday's,or during the weekends. Inmates should receive on a Monday. Jpays are getting to inmates from 4 days if your lucky to 7 to 10 days. Sometimes never received.The problem lies that many of us in Ad-Seg may be labeled as STG, or OIG or Safe Prisons has us on the watch list.This means tha our Jpays are sitting in STG's OFFICE for days at a time. Ive received posted notes attached to my Jpays to forward to STG.There is NO excuse to withhold Jpays, when STG has ACCESS to all our electronic mail via computer. We ask that Jpays be expidited on a timely fashion. When mone is deposited in your account,it shows in our monthly statement.There is NO PROOF of v-rificatio that your loved one has sent you a jpay.If the grinder printer is not working the Jpay is never printed out. Only after families write snail mail and ask why havent you answered the Jpay I h-ave sent you?? Families cant even log on to check their history of past Jpays they have sent y Like the warden and Safe prison's can. END QUOTE, of 1 COMPLAINT.

\* QUOTE OF A 2nd/separate COMPLAINT, served to Administration (warden act),AUG 2019:

QUOTE--- 11) MAIL: Its become a common practice mailroom personale is overlooking PROPER POLICY with our incoming and outgoing mail. By sitting on our mail past DUE its set policy timing.
For example: The email/Jpay's coming in.
As it is, our families PAY THIS ELECTRONIC SERVICE as its suppose to be a much FASTER delivery service. But yet mailroom neglects complying by the CONTRACT AGREEMENT with Jpay Company.In th sense what is the CONTRACT? But yet TDCJ Mailroom does NOT deliver/process incoming emails a such advertised posting? **FASTER DELIVERY ?** Based on Jpay's AD's, we are to get a Jpay within 48 hour span or SOONER but yet.TDCJ MAILROOM sit's on our Jpay's way beyond its set timing,som times Jpay's do not get processed for 5 to 12 days. Snail mail; is Also being held way beyond its set SORTING POLICY.
**AS OF MARCH 1, 2020 :TDCJ HAS IMPLEMENTED SOME NEW OFFENDER MAIL POLICIES.**

see;   https://www.tdcj.texas.gov/news/inspect2protect.html

\*Suggestion/Solution:

Based on the ABOVE and admittedly By TDCJ Officials. There is a MAJOR CONTRABAND PROBLEM throu gh Offender's Mail ?

[...] [play] [along] with HALF "EDUCATION COMPUTERS",other televisors (Prison System.) a type of TABLET.

Why does TDCJ NOT focus and take this advanced/secured system?? Would this NOT be more BENEFIC-
IAL TO THEIR OWN MAILROOM EMPLOYEES??
1. Less man power/staff to sort/inspect incoming/outgoing mail.
2. LESS CONTRABAND PROBLEM.

## *** POSITIVE AFFECTS: GIVING OFFENDERS ACCESS TO TABLETS-

Specifically speaking: AD-SEG OFFENDERS, would have access to REHABILITATIVE MATERIALS.

Build/work on parental closure with their children, build/work on relationships with loved ones
/access to religious materials/ email viewing/replying to emails./ audio & visual stimulation
access/ *as more COMMUNICATION with family's bring POSITIVE results and MOTIVATES OFFENDERS TO
TRANSITION FASTER.
*THINK ABOUT it, place yourself in a small segregated cell, with no regular contact to your ch-
[ild]. Months, YEARS?
You get a chance to speak to this child....his/her works will do what, to YOU?????Even more so
Once you all build a more regular form of contact/communication and your child ASK YOU, Dad/Mom
when are you coming home????    THINK about the psychological AFFECTS positive and negative will
bring to you??? Even more; very likely most offenders will embrace the POSITIVE AFFECTS, and
this contact/communication will become a FORM OF  THERAPY. A FASTER TRANSITIONAL AFFECT TO
THIS "OFFENDER", that has been isolated for YEARS.
Please do NOT try to compare an AD-SEG Offender' and General Population Offender's  state of
MIND at the same.
EXPERTS can show you the major difference. We are dealing with 2 different stages of mental sta-
tes.

## 2) TX.GOV. CODE§ 501.009 : VOLUNTEER ORGANIZATIONS.

The department shall actively encourage volunteer organizations to provide the following progr-
ams for inmates housed in facilities operated by the department:

(1) Literacy and education programs    (2) life skills programs  (3) job skills programs
(4) parent-training programs  (5) drug and alcohol rehabilitation programs
(6) support groups  (7) arts and crafts programs          and;
(8) other programs determined by the department to aid inmates IN THE TRANSITION BETWEEN
CONFINEMENT AND SOCIETY AND TO REDUCE INCIDENCE OF RECIDIVISM AMONG INMATES.

## *CONTRADICTIVE:

Its a PROVEN FACT, TDCJ has NOT Practiced this TX.GOV.CODE. For year's AD-SEG OFFENDERS do not
have any type of REHABILITATIVE PROGRAMS, muchless practice a transition nor Positive Educatio-
nal program to its SEGREGATED OFFENDERS.
Through an "OPEN RECORDS" SURVEY, you will witness such neglected doing.
Sure enough, TDCJ started an Ad-Seg PRE-RELEASE type of MONTHLY PROGRAM. For those that have made
parole or discharged their sentence. But how can you even TRY to use these so called transition
programs on an OFFENDER that has been ISOLATED IN A SEGREGATED cell for 5-10-15-20 YEARS???? He
could he be "MENTAL STABLE" to be RELEASED INTO OUR COMMUNITIES??
Common sence tell's US, wouldnt it be MUCH WISER to initiate these transinions/rehabilitative
doings on an EARLIER stage of his incarceration/placement in AD-SEG/Restrictive Housing??
Offender's in AD-SEG would eagerly enroll and partake in any positiveproductive programs if
TDCJ/POLICY MAKERS would offer them.

(5)

TDCJ Officials HAVE USED THE COMMON "EXCUSE": LACK OF STAFF prohibits many practices.
So instead of truly thinking of a SOLUTION they use misleading tactics on OUR TAX PAYERS.
(They Falsify Government Records/Documents, this is a PROVEN FACT.
TABLETS OFFERED WOULD TRULY BRING MANY "SOLUTIONS" TO THE ABOVE.

Many Texas County Jails already use this PRACTICE (use of tablets) with extreme POSITIVE RESUL-
TS). * Harris county Jail is a prime example.

### CONCLUSION

As a CONCERNED CITIZEN & TAX PAYER, I plead to you and ALL POLICY MAKERS to firmly INVESTIGATE
this TORTUROUS & INHUMANE TREATMENT my loved one continually faces. DAILY within his segregated
cell. SOLITARY CONFINEMENT PRACTICES ARE NOT A SECRET.

MY LOVED ONE:

_Jochun Jennings_____,TDC#_____,at the JAMES V?ALLRED
UNIT, 12 Bld AF-SEG/Restriction Housing.Is currently MIS-HOUSED.When HE IS PAST DUE for LESS
RESTRICTIVE HOUSING.
I eagerly await your response,please feel free to CONTACT ME AT ANY AVAILABLE TIME. I truly
HOPE YOUR AGENCY/ORGANIZATION can assist me and MANY CONCERNED CITIZENS OF THE STATE OF TEXAS.
BE BLESSED!

RESPECTFULLY SUBMITTED:

S/_____

* Contact on FRONT PAGE.*

ENCLOSED:

_____ PG COMPLAINT

(7)

*You have received a* **jpay** *letter, the fastest way to get mail*

From : Sam Rosen, CustomerID: 18006078
To   : JULIO ZUNIGA, ID: 01961551
Date : 12/11/2021 4:55:45 PM EST,   Letter ID: 1356677209
Location : DA
Housing : K-1   21

Hey Z! I hope you're well - saw this article and thought you might be interested in it:  Their Crimes, Our Punishment: TDCJ's State-Wide Deadly Use of Force Cover-Ups  By Jason Renard Walker  The Texas Department of Criminal Justice (TDCJ) has a very secretive state-wide deadly use of force policy. This unwritten policy's designs give guards the ability to beat and kill prisoners, while facing minimum, if any, punishment themselves.  The Clements Unit in Amarillo, TX; Robertson Unit in Abilene, TX; Ferguson Unit in Midway, TX; Eastham Unit in Lovelady, TX; Telford Unit in New Boston, TX; Allred Unit in Iowa Park, TX; Ellis Unit in Huntsville, TX and Polunsky Unit in Livingstone, TX have been confirmed through my research, and each unit's own paperwork, to utilize this same deadly conduct. Essentially, this is a felonious state-wide conspiracy, given that guards often transfer prisons for a variety of reasons. And regardless of what TDCJ unit it is, the abuse of prisoners, and their conspiring to cover them up, occurs in the same fashion. Often receiving a mandate of approval from the same Step 2 grievance investigator and Ombudsman complaint investigator that oversees complaints on several units.  During my 13 years' stay in Texas prisons, I've witnessed many uses of force on inmates. Some, the individual drew on themselves; some crafted by ranking guards for retaliatory reasons. But I have yet to see any that didn't run afoul of the "use of force plan" policy that can be read in any TDCJ law library.  Words like "minimum use of force necessary to gain compliance", "by placing the offender", and other soft phrases are riddled throughout the manual, casting the illusion that prisoners are handled with the most professional care during a cell extraction.  Not only does TDCJ policy forbid guards from choking, punching, kicking, or assaulting prisoners out of ill-will and malice, it specifically instructs guards not to hog-tie or twist a prisoner's legs together then apply leg restraints.  It also has steps on how to decontaminate a prisoner who has been sprayed with chemical agents and what to do when witnessing prisoners are in the vicinity and exposed to chemical agents themselves.  If any citizen in the public was to first read TDCJ's "use of force plan", then watch a use of force that the administration deemed in compliance, it would shock their conscience to discover how often guards run afoul of it and abandon using the policy altogether. And their oversight's complicity in covering them up through rubber-stamped replies to complaints filed by concerned citizens.  During my stay at Polunsky Unit, spanning June 2021-October 2021, I saw and learned that 12-Building Captain Carter (who is supposedly gang affiliated) and the administration were engaged in promoting and covering up a muder and beatings of prisoners by Sergeant Schwarz, Lieutenant Sliger, and other members of the cell extraction team.  This is how it works  Polunsky Unit's 12 Building, home to TDCJ's Death Row, and 11 Building, are places where prisoners are single-cell-housed, unable to go back and forth without restraints, and at the mercy of random guards for their most basic needs. It's a common hotspot for abusive cell extractions. It's a coward's paradise for guards who enjoy assaulting prisoners under the color of law and getting away with it clean. What needs to be scrutinized is the fact that the administration is very aware that the cell extraction teams are assaulting prisoners and writing false disciplinaries to justify the use of force. Coincidentally, days or a week or so after the prisoner is badly beaten, he is shipped off to another prison. Sometimes hundreds of miles away from Polunsky. I was only there four months, and three verifiable accounts of this happening occured between July 2021 - September 2021 in Polunsky's 11 Building. One account I witnessed myself, and the other two were recited by a prisoner who'd spent several weeks in 11 Building. It's possible more occurred! All three involved Sergeant Schwarz, who'd also been fingered by another prisoner as being involved in a use of force that resulted in a prisoner dying in the last year or so. By shipping the prisoner to another prison quickly, the chances of him filing a complaint or pursuing a lawsuit is lessened, since a unit transfer is sometimes good enough for him. Likewise, if he does insist on getting outside help involved, this new prison has no way of adequately investigating the claims. They'll simply relay his complaint back to the unit and go along with whatever response they email back. Or they'll claim to have closed the investigation since the prisoner is no longer there. The warden and the Unit Classification Committee (UCC) are the only two entities authorized to have a prisoner transferred, or make the recommendation. The State Classification Committee (SCC) can override these decisions. This can only suggest that the UCC and wardens are well aware that these unit transfers are being done to clean house, save face and block the beaten prisoner from passing word to his associates, who may rebel and riot in response. A state-wide deadly force cover-up! On July 22nd 2021, I, and several other prisoners, witnessed Marquis Kingsbury #2303732 get gassed and beaten by Sgt Schwarz, Lt Sliger and other cell extraction team members.[1] Days after the beating, he was transferred to another prison.  Several policy violations occurred but were obviously covered up, namely: 1) a ranking guard assisting in the use of force without body armor, making it obvious they knew Kingsbury wasn't a threat. 2) This same ranking guard gassing Kingsbury then immediately rushing in the cell. Making it obvious Kingsbury wasn't asked to follow an order or gassed for refusing. 3) This same ranking guard never giving Kingsbury any orders because the cell extraction was a staged beatdown from the start. See the video! In my initial report, I named a Lt Corbett as one of the assaulters. Warden Dickerson claimed that Corbett wasn't involved. That leaves Lt Sliger (Popeye) who looks similar to Corbett. In any event, it was one or the other. Abuse - The Cultural Norm  Listening to prisoners from various prisons talk about their experiences with cell extractions, and their similarities to mine, brought me to the conclusion that the deadly use of force methods are the same state-wide. The cover-ups, a cultural norm. Here's a few examples given

You have received a **jpay** letter, the fastest way to get mail

From : Sam Rosen, CustomerID: 18006078
To   : JULIO ZUNIGA, ID: 01961551
Date : 12/11/2021 4:55:45 PM EST,   Letter ID: 1356677209
Location : DA
Housing : K-1   21

to me by several prisoners: In the spring of 2019, inmate Montgomery was slammed in the Ferguson Unit hallway by several guards. He suffered broken ribs and other injuries that required medical staff to revive him several times. He died as a result and had blue lips while being hauled to the infirmary. He was still alive when he went to the hospital. Between Nov 2020-Feb 2021, Ferguson Unit's Lt Norman, a sergeant and two guards beat an "old school" black inmate to death in his psychiatric observation cell because a female guard had told them he'd been masturbating in his cell. At the time he was on suicide prevention watch. Several months ago at the Eastham Unit, an inmate was beaten to death by the cell extraction team. The Allred Unit and Clements Unit both had an inmate who died by the hands of guards. Clements Unit's Cpt Patricia Flowers was responsible for gassing an inmate to death last year during my stay there. In many instances, I've seen guards get promoted following an incident involving them and the serious injury or death of an inmate. These rogues aren't showing signs of slowing down, despite some getting fired and others held criminally responsible.  Until prisons are abolished in their current state, sadistic-minded guards will always have a safe haven to engage in their criminal deeds; surrounded by barb-wire fence and bricks, and inaccessible to the public. Dare to struggle, dare to win! All power to the people Jason Renard Walker #1532092 Alfred    Hughes    Unit    Route    2,    Box    4400    Gatesville,    TX    76597    [1] https://sfbayview.com/2021/08/black-texas-prisoner-gassed-brutalized-in-solitary-confinement- cell/

**jpay** Tell your friends and family to visit www.jpay.com to write letters and send money!

Use of Force policy - UNCONSTITUTIONAL
Drug Testing Policy - UNCONSTITUTIONAL
Disciplinary Corruption UNCONSTITUTIONAL
Law Library - UNCONSTITUTIONAL
Grievance - UNCONSTITUTIONAL